The plaintiff, Travis Couch, appeals from a summary judgment for the defendants, Richard Lesley and the City of Sheffield, in this action seeking damages under state and federal law in connection with an alleged illegal arrest and an alleged malicious criminal prosecution. Couch also complains of the denial of his motion for a partial summary judgment on the issue of the defendants' liability. We affirm.
Lesley, a nine-year veteran of the Sheffield Police Department, arrested Couch at the Stagecoach lounge in the early morning hours of July 2, 1995.[1] Couch, along with another man arrested at the same time, Billy Joe Berryman,[2] was charged with public intoxication and taken to jail. Berryman, who admitted to being under the influence of alcohol and marijuana, eventually pleaded guilty to public intoxication. Couch was tried in the Sheffield Municipal Court and was acquitted.
Couch filed this action on March 25, 1996. He sought damages from Lesley under state law, based on allegations of intentional and malicious false arrest/imprisonment, malicious *Page 146 
prosecution, and an illegal "strip search." He also sought damages from the City, based on allegations of negligent or wanton failure to properly train, supervise, and discipline Lesley; on allegations of intentionally encouraging and covering up illegal police conduct; and on allegations of liability under the doctrine of respondeat superior.[3] Couch also sought to recover damages from Lesley and the City under42 U.S.C. § 1983 (providing a cause of action for deprivation of constitutional rights by government officials acting "under color of state law") and § 1985 (providing a cause of action based on allegations of a conspiracy to deny constitutional rights and to obstruct justice). His federal claims were based on allegations of intentional and malicious false arrest/imprisonment, defamation, malicious prosecution, and an illegal "strip search."
In support of their motion for summary judgment, the defendants submitted, among other things, the affidavits of Lesley, Al Blackburn, and Doug Aycock. Those affidavits read as follows:
 "My name is Richard Lesley. I am over the age of 19 years and reside in Colbert County, Alabama. I am employed by the City of Sheffield, Alabama as a police officer and have been so employed for over nine (9) years. In addition to my nine (9) years experience as a police officer, I have been duly certified as qualified to be a police officer by the Alabama Peace Officers Standards and Training Commission in accordance with the provisions of the laws of Alabama and have attended various schools and seminars in connection with my employment.
 "On the morning of July 2, 1995, (Sunday) at approximately 12:40 a.m., I was patrolling on Second Street near the Stagecoach Lounge in Sheffield in a patrol car. The Police Department had been requested by the proprietor of the Stagecoach Lounge to pay extra attention to his business inasmuch as he had experienced problems with persons who were intoxicated and had become disorderly, both inside and outside of the Stagecoach Lounge and with narcotic sales, thefts and damage to vehicles in the parking lot. I and other Sheffield police officers had made arrests at the Stagecoach Lounge for narcotics violations and intoxication by persons similarly situated to the two (2) persons I observed on this occasion. These persons were identified as Billy Joe Berryman and Travis Ray Couch. I had found drugs and paraphernalia on the pavement in the location where they were standing. In driving by the Stagecoach Lounge on the morning of July 2, 1995, I noticed these two (2) persons standing to the west of the Stagecoach Lounge building around the corner of the building in the shadows. They were huddled up together appearing to me to be engaged in some suspicious activity. I turned the patrol car into the parking lot of the Stagecoach Lounge, and when I was noticed by the two (2) persons they began to move quickly towards the entrance of the lounge and away from me. I addressed the two (2) persons and asked them to stop because I wanted to speak with them. I got out of the patrol car and walked up to them, approached them, and talked to them. I had radioed for a backup patrolman and he arrived at this time.
 "During my experience as a police officer I have had many occasions to observe intoxicated persons and have made many arrests for public intoxication and driving under the influence. Also, I am familiar with the smell of marijuana and alcohol on a person who has used or consumed these substances.
 "In standing near the two (2) persons and talking with them, I smelled marijuana and alcohol on both of them. One of the persons identified as Billy Joe Berryman was obviously extremely intoxicated. The other identified as Travis Ray Couch was less intoxicated. Mr. Couch appeared to be nervous, and his eyes were glazed and red, and based upon my observation of him, I was of the opinion that he was under the influence of either alcohol or some substance. Also, Mr. Berryman, in *Page 147 
my opinion based on my observation, was under the influence of something, either alcohol or marijuana. At that time, I placed both of these gentlemen under arrest.
 "At that time it was my opinion that both Mr. Couch and Mr. Berryman were in such a condition that they were a danger to themselves and to the public, and that neither of them could safely operate a motor vehicle. Both Mr. Couch and Mr. Berryman were taken to the Sheffield Municipal Building and booked for public intoxication.
 "At that time Mr. Berryman, who admitted he was under the influence of alcohol and marijuana, gave me permission to search his motor vehicle which was parked in the lot of the Stagecoach Lounge. After leaving Mr. Couch and Mr. Berryman in the care of the policeman on duty at the Sheffield Municipal Building, I returned to the Stagecoach Lounge parking lot and investigated the vehicle identified by Mr. Berryman, and in said vehicle found marijuana and associated paraphernalia. The vehicle was located in close proximity to where Mr. Couch and Mr. Berryman were standing when I first saw them.
 "In transporting Mr. Couch from the Stagecoach Lounge to the Sheffield Municipal Building he made a statement to the effect that he did not believe that he was intoxicated and asked if when I found that out, I would give him a ride back to his car parked at the Stagecoach Lounge.
 "When Mr. Couch's case was set for trial in the Sheffield Municipal Court, he was represented by Attorney Cliff Wright, and Mr. Wright asked me if I would have any objection if the charge against Mr. Couch were not prosecuted, inasmuch as Mr. Couch was of young age and apparently had no other prior conviction and did not cause any problems or difficulties at the arrest or while in jail at the Sheffield Municipal Jail. I told Mr. Wright that since I had gotten Mr. Couch off the street so as not to be a danger to himself or others, I had no objection if the city prosecutor did not want to proceed with the prosecution. For some reason the case was not reached on that occasion, and at a later setting Mr. Couch was represented by Attorney Dennis Odem, and Mr. Odem asked the same thing of me that Mr. Wright had asked, and I told him as well that I had no objection to Mr. Couch not being prosecuted for the charged offense if the city prosecutor did not want to pursue the matter.
 "Mr. Berryman pled guilty to the charge against him and was duly fined by the municipal judge. Mr. Couch was tried and found not guilty by the municipal judge."
 "My name is Al Blackburn. I am over the age of 19 years and reside in Colbert County, Alabama. I am employed by the City of Sheffield, Alabama, as a police officer. I hold the rank of Captain. I have been employed as a police officer with the City of Sheffield, Alabama, for over the past 15 years. In addition to my 15 years of experience with the City of Sheffield, Alabama, I have been duly certified as qualified to be a police officer by the Alabama Peace Officers Standards and Training Commission in accordance with the provisions of the laws of Alabama and have attended various schools and seminars in connection with my employment.
 "On the night of July 1 (Saturday night) and the morning of July 2, 1995 (Sunday Morning), I was on duty and on patrol. I have reviewed the dispatch log of the Sheffield Police Department for the morning of Sunday, July 2, 1995. On that evening, I was operating Unit 10. At 12:37 AM, Officer Richard Lesley radio[ed] in that [he was] checking out two white males at the Stagecoach Lounge and requested backup. I responded to the backup call and arrived at 12:39 AM. When I arrived Officer Lesley was questioning two white . . . males next to the Stagecoach Lounge. I came to the same location and observed both individuals being questioned by Officer Lesley. One, who was identified as Billy Joe Berryman, was obviously extremely intoxicated. The other man, identified as Travis Ray Couch, was intoxicated, but to a lesser extent than Billy Joe Berryman. I was able to observe both men closely. Both men had strong odor of marijuana about their persons and clothing. I could smell a strong odor of alcohol on the breath of *Page 148 
both Billy Joe Berryman and Travis Ray Couch. Travis Ray Couch had eyes which were red and glazed. He appeared to be nervous and unbalanced while standing and being questioned. After I arrived, Officer Lesley went and search[ed] the area along the west side of the Stagecoach Lounge where he first stated he had observed Mr. Berryman and Mr. Couch huddled together. I stayed with Mr. Berryman and Mr. Couch while Officer Lesley searched this area. After Officer Lesley returned from searching the area, Officer Lesley placed both Mr. Berryman and Mr. Couch under arrest for public intoxication.
 "As a police officer, I have observed many persons who are intoxicated. I have observed persons who are intoxicated from the use of alcohol alone; from the use of alcohol and marijuana; from the use of alcohol and other drugs; from the use of marijuana alone; and from the use of drugs. I have made numerous arrests for public intoxication and driving under the influence of both alcohol and marijuana, either used separately or used in combination. I am familiar with the requirements of section 13A-11-10, Code of Alabama 1975, for the crime of public intoxication.
 "Based on my independent observations of Travis Ray Couch at about 12:39 AM until I cleared at 12:46 AM, there was probable cause to arrest Travis Ray Couch for public intoxication. Mr. Couch had odors of alcohol and marijuana on his breath and clothing. His eyes were red and glazed, which is [a] sign of intoxication. He appeared nervous and unbalanced which are signs of intoxication. In my opinion Mr. Couch was not in a condition to operate a motor vehicle or attempt to carry on all normal functions of everyday life without endangering himself or other persons. Based on my observations, I would have placed Travis Ray Couch under arrest for public intoxication on the morning of Sunday, July 2, 1995 between 12:39 AM and 12:46 AM.
 "Previous to the morning of July 2, 1995, the Sheffield Police Department had been requested by the [owner] of the Stagecoach Lounge to pay extra attention to his business. He had previously experienced problems with persons who were intoxicated and had become disorderly, both inside and outside of the Stagecoach Lounge. He had also complained about narcotic sales, thefts and damage to vehicles in his parking lot. I, and other Sheffield police officers, have made numerous arrests at the Stagecoach Lounge for narcotics violations, possession of marijuana and public intoxication of persons in the parking lot of the Stagecoach Lounge."
 "My name is Doug Aycock. I am the Chief of Police for the City of Sheffield, Alabama, and have held that job for approximately ten (10) years. The City of Sheffield has thirty-two (32) police officers, all of whom, except for two (2) most recent hires, have been duly certified by the Alabama Peace Officers Standards and Training Commission in accordance with the provisions of Alabama law as qualified police officers. The two (2) most recent hires by the City of Sheffield as police officers will attend the necessary schools as soon as the next classes in these schools are open and available to them. It is the requirement of the City and the laws of the State of Alabama that police officers be certified.
 "The City of Sheffield, through the Civil Service Board of the City, has adopted rules and regulations for the government and administration of the Police Department. A copy of these rules and regulations is attached hereto, marked Exhibit 'A' and made a part hereof by reference thereto. [The exhibit is omitted from this opinion.] These regulations set forth the Police Department's responsibilities and relationships in the Sheffield community. The role of the Sheffield Police Department is to enforce the laws in a fair and impartial manner, recognizing both the statutory and judicial limitations of police authority and the constitutional rights of all citizens. As the Chief of Police and the chief executive officer of the Sheffield Police Department, I have the responsibility and the authority to manage, direct and control the operation and administration of the Police Department. Every employee of the Police Department is under an obligation *Page 149 
to accomplish the objectives of the Police Department by thorough compliance with police rules and regulations. In addition to the Standard Operating Procedures attached hereto and marked Exhibit 'A,' as the Chief of Police, I have issued orders from time to time which supplement the Standard Operating Procedures.
 "Prior to the suit by Travis Couch, during the ten (10) years that I have been the Chief of Police in Sheffield, Alabama, there has only been one (1) other suit brought against the City of Sheffield and a police officer. This suit was tried in the Circuit Court of Colbert County and resulted in a verdict in favor of the City and the police officer.
 "During the period from July 1994 through July 1995, the Sheffield Police Department had the following contacts made at the Stagecoach Lounge located on Second Street in the City of Sheffield:
"3 incidence/offense reports
"13 arrests for public intoxication
"31 calls for service
 "The operators of the Stagecoach Lounge have requested the Sheffield Police Department to give extra attention to this place of business inasmuch as they have experienced problems with public intoxication, drunkenness, and damage to vehicles in the parking lot."
In response to the defendants' motion for summary judgment, and in support of his own motion for a partial summary judgment, Couch submitted a copy of a "Notice of Claim" that he says he filed with the City in accordance with Ala. Code 1975, § 11-47-23. This document, which was signed by Couch and notarized by his attorney on April 1, 1996, is not stamped "filed," and it contains nothing otherwise indicating that it was filed with the City clerk. The document contains a section entitled "Factual Allegations," which reads as follows:
 "During 1995, the plaintiff was the assistant manager of REX TV AND APPLIANCES, a large retail store located in Florence, Alabama.
 "On July 1st and 2nd of 1995, the plaintiff worked long hard hours completing a store inventory, which included reconciling and consolidating store accounts.
 "At approximately 11:47 p.m. on July 2, 1995, the plaintiff, after another long and exhausting day, left work and decided to go to the Stagecoach Lounge in Sheffield, Alabama, to have a drink and unwind before going home.
 "Plaintiff arrived at the Stagecoach Lounge and ordered a Long Island Tea. After taking one sip, he asked the hostess, Mrs. Vicky Berriman, to watch his drink while he went outside where it was cooler to talk with her husband, Mr. Billy Berriman.
 "Plaintiff smoked a cigarette and talked to Mr. Berriman near the door of the lounge for 10-15 minutes. As they were going back inside, city police officer Richard Lesley pulled into the parking lot and ordered them to stop.
 "Officer Richard Lesley asked the plaintiff for identification, which the plaintiff provided. Plaintiff also respectfully, courteously, quickly, and accurately answered repeated questions as to his employment, residence, phone number and social security number.
 "Officer Richard Lesley then searched plaintiff's wallet. Next, and without probable cause, Officer Richard Lesley ordered the plaintiff and Mr. Berriman to empty their pockets.
 "Officer Richard Lesley discovered cigarette rolling papers in the possession of Mr. Berriman. Mr. Berriman admitted that he used them to roll marijuana cigarettes, but Mr. Berriman denied having recently smoked any marijuana.
 "At that point, perhaps 8-10 minutes after the illegal stop and seizure of the plaintiff and Mr. Berriman, Officer Richard Lesley said to the plaintiff that 'now that I think about it, you smell like [marijuana] too.'
 "Additional police officers arrived and searched the area for marijuana or anything incriminating that the plaintiff and Mr. Berriman might have possessed, but there was nothing to find.
 "Officer Richard Lesley then handcuffed the plaintiff and placed him under arrest *Page 150 
for public intoxication, even though none of the statutory elements for the offense of public intoxication were present. Apparently defendant Officer Lesley had no formal training in the elements required for a valid public intoxication arrest.
 "Prior to arresting the plaintiff, Officer Lesley at no time asked or was in any way concerned with how the plaintiff arrived at the lounge, whether he had a car, whether he came with a friend, whether he was dropped off by a friend or by a taxi, or how he intended to go home.
 "Plaintiff was transported to the Sheffield City Jail where he was booked and strip searched, in which the plaintiff was forced to undress and reveal his genitals and spread the anal area of his person. This strip search was conducted without reason or cause to believe that weapons or contraband was being concealed on or in the body of the plaintiff.
 "Plaintiff was questioned repeatedly about any knowledge he had about drug dealing at the Stagecoach Lounge. Defendant Lesley told the plaintiff that if he would only cooperate that [he] could go home; however, the plaintiff had no knowledge of any drug dealing at the lounge.
"Plaintiff was then placed in jail.
 "Plaintiff was released on $500.00 bail at 9:00 a.m. on the morning of July 3, 1995, having been unable to get any rest at the Sheffield City Jail.
 "Plaintiff, who had little sleep over the past two days due to long work hours, and emotionally and physically exhausted and drained from the traumatic illegal arrest and false imprisonment, went home, cleaned up, and decided to try and get one hour of sleep before reporting to work at 11:00 a.m.
 "Plaintiff, virtually unconscious from his ordeal, failed to respond to his alarm clock and was several hours late for work.
 "As a direct and proximate cause of the illegal arrest and false imprisonment, the plaintiff was almost fired, suffering instead a demotion from assistant manager to salesman, with a devastating adverse impact upon his salary, compensation, and future with REX TV AND APPLIANCES.
 "Officer Lesley reviewed the facts and charges with City Prosecutor Benjamin Gardner and they agreed that there was insufficient probable cause to prosecute the case. The prosecutor offered to dismiss the charge against the plaintiff upon payment of costs. However, because the plaintiff was innocent, he refused.
 "Subsequently the prosecutor offered to dismiss the charge against the plaintiff if the plaintiff would only sign a waiver relinquishing his right to sue the City for false arrest, illegal imprisonment, and malicious prosecution. The plaintiff refused because he was concerned that other innocent citizens might suffer similar constitutional violations if the matter was simply covered up by a waiver and dismissal of the spurious charge.
 "Prior to plaintiff's trial in Municipal Court for the City of Sheffield, Officer Lesley advised the prosecutor that the plaintiff had simply 'been in the wrong place at the wrong time,' and Officer Lesley recommended that the baseless charge against the plaintiff be dismissed. However, the prosecutor refused unless the plaintiff signed the waiver.
 "The undersigned attorney, Dennis Odem, had interviewed Officer Lesley prior to the trial to determine the reasons for the plaintiff's arrest. Officer Lesley candidly admitted that none of the elements for a public intoxication offense had been committed by the plaintiff, that the plaintiff had simply been 'at the wrong place at the wrong time,' and Officer Lesley wanted the charge dismissed. Officer Lesley admitted that his primary motivation in arresting the plaintiff was the City's efforts and desires to stop alleged drug trafficking and drug use at the Stagecoach Lounge.
 "During the lengthy conversation with Mr. Odem, Officer Lesley never suggested that his decision to arrest the plaintiff was in any way based upon his concern for either the safety of the plaintiff or the public. Officer Lesley never mentioned anything about any concern or thoughts he might have had about the plaintiff driving his car, or anyone else's car. *Page 151 
 "When the plaintiff refused to sign a waiver of his right to sue the City, the prosecutor advised Mr. Odem that he was 'going to fight it all the way.' In order to cover up the illegal arrest and malicious prosecution, the prosecutor and Officer Lesley conspired to fabricate the story that the plaintiff was arrested because Officer Lesley feared that the plaintiff was going to drive a car and that he might therefore be a danger to himself and the public.
 "Plaintiff was tried in a bench trial in the Municipal Court for the City of Sheffield, Alabama, [and] on January 11, 1996, the Honorable Polly T. Ruggle found the plaintiff not guilty on the charge of public intoxication.
 "The City of Sheffield, through its policy maker and highest City official in this area of responsibility, the city prosecutor, encourages such illegal arrests and malicious prosecutions by police officers because the officers know that they are not likely to be disciplined when the city prosecutor is willing to fabricate evidence and/or testimony to cover up an illegal arrest to protect the City from civil liability.
 "When faced with an obvious illegal arrest, the practice of the city prosecutor is not to promptly dismiss the charges, or to take remedial or disciplinary steps with the police officer(s) involved, but . . . to try to cover up the police misconduct by coercing the victim into signing a waiver of City liability.
 "Officer Lesley was never disciplined or even criticized by the prosecutor or the City of Sheffield, except for the prosecutor's vehement criticism of Officer Lesley for talking candidly and truthfully to Mr. Odem during Mr. Odem's investigation of the public intoxication charge.
 "All Defendants were, at all times relevant hereto, acting under color of state law and within the scope of their employment and duties."
It appears from a comparison of the "Notice of Claim" with Couch's complaint that the above-quoted section entitled "Factual Allegations" was simply lifted from the complaint and incorporated into the "Notice of Claim." The notary's certification on the last page of the document states:
 "Before me, [Couch's attorney], a Notary Public in and for said county and state, did personally appear Travis Couch, who, being first duly cautioned and sworn, avers that he has read and understands the information in the foregoing Notice of Claim and he affixes his signature thereto
before me this 1st day of April, 1996."
(Emphasis added.) Couch also submitted unverified copies of portions of the transcript of his trial in the municipal court on the public intoxication charge, as well as copies of the defendants' answers to interrogatories. Couch's "Narrative Summary" of "undisputed facts," contained in his motion for a partial summary judgment, was drawn from his attached "Notice of Claim" and the copies of the transcript of his trial in the municipal court.
The defendants make a number of arguments in support of the summary judgment. Specifically, Lesley argues that he was entitled to a judgment as a matter of law on the state law claims (the claims based on allegations of intentional and malicious false arrest/imprisonment, malicious prosecution, and an illegal "strip search"), under Ala. Code 1975, § 6-5-338, which extends discretionary function immunity to city police officers. According to Lesley, there is no evidence indicating that he acted willfully, maliciously, or in bad faith when he arrested Couch, so as to take him out from under the protection of the doctrine of discretionary function immunity. See Wrightv. Wynn, 682 So.2d 1 (Ala. 1996). With respect to the § 1983 claim, Lesley argues that he is protected under the doctrine of qualified immunity as expressed in Harlow v. Fitzgerald,457 U.S. 800,102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). He also argues that there is no evidence supporting either the allegations of intentional and malicious false arrest/imprisonment, defamation, malicious prosecution, and an illegal "strip search," or the allegations under § 1985 of a conspiracy to deny Couch's constitutional rights or to obstruct justice. The City argues that it was entitled to a judgment as a matter of law on the state law claims (the claims based on allegations of negligent or *Page 152 
wanton failure to train, supervise, or discipline Lesley; on allegations of intentionally encouraging and covering up illegal police conduct; and on allegations of liability under the doctrine of respondeat superior) either under the immunity extended to municipalities in Ala. Code 1975, § 11-47-190, or on the ground that there was no evidence to support the claims. The City also maintains that the state law claims must fail because, according to the City, Lesley failed to timely file a notice of a claim with the City, in accordance with § 11-47-23. As to the § 1983 claim, the City, relying primarily on Monellv. Department of Social Services of the City of New York,436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), argues that it cannot be held liable for Lesley's actions under a respondeat superior theory. The City argues that there is no evidence indicating that Lesley illegally arrested Couch pursuant to a policy officially adopted or implemented by the City and that there is no evidence otherwise supporting any of the allegations underlying the § 1983 or § 1985 claims.
Relying on the "Notice of Claim" and the "Factual Allegations" section contained therein, as well as the unverified copies of the transcript of his trial in the municipal court, Couch contends that Lesley lacked probable cause to arrest him for public intoxication. The gravamen of Couch's claims, both state and federal, is that Lesley, pursuant to official City policy, intentionally and without justification singled him out for arrest and demeaning interrogation for the purpose of harassing him, in an attempt to obtain information about possible drug trafficking at the Stagecoach Lounge, and that the City attempted to cover up any wrongdoing on Lesley's part by threatening Couch and fabricating evidence, i.e., by suborning perjury on the part of Captain Blackburn, who, according to Couch, provided false testimony as to Couch's condition at the time of the arrest.
After reviewing the record and the briefs, and after carefully examining the very serious charges of misconduct leveled by Couch against the defendants, we conclude, as the trial court did, that the defendants were entitled to a judgment as a matter of law.
A summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P. In determining whether a summary judgment is appropriate, a court must view the evidence in the light most favorable to the nonmoving party, and all reasonable doubts concerning the existence of a genuine issue of material fact must be resolved against the moving party. Wayne J. Griffin Electric, Inc. v.Dunn Construction Co., 622 So.2d 314 (Ala. 1993). Rule 56(e) provides:
 "Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against him."
We do not consider the "Notice of Claim" and the accompanying unverified copies of the municipal trial transcript to be sufficient in form to satisfy Rule 56(e) and, thus, to defeat the motion for summary judgment. See Osborn v. Johns,468 So.2d 103 (Ala. 1985). It is significant, we think, that the "Notice of Claim" is not in proper affidavit form. An affidavit sufficient to satisfy Rule 56(e) is a written declaration or statement of facts, made voluntarily and based on personal knowledge, and confirmed by the oath or affirmation of the party making it, taken before a person having authority to *Page 153 
administer an oath or affirmation. See Black's Law Dictionary, "Affidavit" (6th ed. 1990); Rule 56(e). It is apparent that Couch's "Notice of Claim" was intended to satisfy § 11-47-23 by putting the City on notice of Couch's allegations of misconduct. It is also apparent that the bulk of the "Notice of Claim," which was filed on or about April 1, 1996, apparently was made up of pages lifted almost verbatim from Couch's complaint, which was filed on March 25, 1996, including the sections entitled "Identity of the Parties," "Factual Allegations," "Count 1 — False Arrest," and "Relief Sought." In the notary's certification, Couch "avers that he has read and understands the information in the foregoing Notice of Claim and he affixes his signature thereto." It is one thing for a person to confirm on personal knowledge and under oath or by affirmation the truthfulness of the contents of a document that he has signed (such a document being an affidavit); it is quite another thing for a person to confirm under oath or by affirmation that he has read, understands, and has signed a document that was intended to satisfy a statutory notice requirement and that contains a section entitled "Factual Allegations," which includes matters ranging from information of which the claimant could have had personal knowledge to other information composed of legal conclusions, hearsay, and speculation. In this respect, we note that in the "Factual Allegations" section Couch does not refer to himself in the first person; rather, he refers to himself in the third person, i.e., calling himself "the plaintiff." Furthermore, the "Factual Allegations" section also contains statements that were allegedly made by Lesley and the city prosecutor to Couch's attorney and with respect to which Couch apparently had no personal knowledge. We conclude, therefore, that the defendants made a prima facie showing of no wrongdoing on their part and that Couch failed to rebut that showing by presenting evidence of misconduct on the part of the defendants, sufficient to satisfy Rule 56. An adverse party may not rest upon the mere allegations or denials of his pleadings. Rule 56(e).
Although the summary judgment was proper for the reasons discussed above, we think it appropriate to point out that even if we were to treat the "Notice of Claim" and the accompanying copies of the municipal court transcript as sufficient to satisfy Rule 56(e), we would still hold that the summary judgment was proper. Section 6-5-338 provides in pertinent part as follows:
 "(a) Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.
 "(b) This section is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers. No immunity is extended hereby to any private non-governmental person or entity, including any private employer of a peace officer during that officer's off-duty hours."
This section extends discretionary function immunity to municipal police officers, such as Lesley, unless the officer's conduct is so egregious as to amount to willful or malicious conduct or conduct engaged in in bad faith. See Wright v. Wynn, supra. However, it would be pure speculation for one to infer from Couch's evidence that Lesley had a personal ill will against him and that he *Page 154 
maliciously or in bad faith arrested him solely for purposes of harassment. There is nothing to reasonably dispute Lesley's affidavit testimony that he believed he had probable cause to arrest Couch based on Couch's appearance and demeanor (he said Couch's eyes were red and glazed; that he was nervous and unbalanced; that he was standing outside a lounge that had a reputation for being a hangout for drug users and drug traffickers; and that he was standing directly next to and talking with a person who was heavily intoxicated and who reeked of alcohol and marijuana), regardless of the fact that Couch was later acquitted of the offense of public intoxication. We further note that the defendants made a prima facie showing, through the affidavit of the police chief, Doug Aycock, that the "strip search" conformed to police department regulations and note that Couch submitted no evidence indicating that Lesley personally participated in the search of Couch's person at the jail or that that search, under the circumstances, was either illegal or in violation of police department regulations. For these reasons, the summary judgment for Lesley on the state law claims alleging intentional and malicious false arrest/imprisonment, malicious prosecution, and an illegal "strip search" would be upheld. As to the state law claims against the City (the claims based on allegations of negligent or wanton failure to properly train, supervise, and discipline Lesley; allegations of intentionally encouraging and covering up illegal police conduct; and allegations of liability under the doctrine of respondeat superior), we note that the City has immunity under § 11-47-190 with respect to each of those claims, except the one based on allegations of negligence in failing to train, supervise, and discipline Lesley. See Scott v. City of Mountain Brook, 602 So.2d 893
(Ala. 1992) (§ 11-47-190 limits the liability of municipalities to injuries suffered through neglect, carelessness, or unskillfulness of an agent, officer, or employee). That claim would also fail, however, because there is no credible evidence to rebut the City's prima facie showing that it did properly train, supervise, and discipline its police officers.
In addition, we note that § 11-47-23 required Couch to file a notice of his state law claims with the City within six months of the accrual of his causes of action. A cause of action is deemed to have accrued under § 11-47-23 when an action can be maintained. See Hill v. City of Huntsville, 590 So.2d 876 (Ala. 1991). Notwithstanding the fact that his trial on the charge of public intoxication was pending, Couch could have maintained an action against the City immediately, at least with respect to his claims based on his allegations of intentional and malicious false arrest/imprisonment and an illegal "strip search" (under the doctrine of respondeat superior), and his claims based on allegations of negligent or wanton failure to properly train, supervise, and discipline Lesley.[4] However, the record indicates that Couch signed the "Notice of Claim" on April 1, 1996, approximately nine months after his arrest on July 2, 1995. Assuming that it was filed on or about April 1, 1996, the notice was untimely as to those claims; and the complaint, which was not filed until March 25, 1996, was not filed in time to satisfy § 11-47-23. Hill v. City ofHuntsville, supra.[5] *Page 155 
With respect to the federal claims against the defendants, we note that Lesley was protected from § 1983 liability under the doctrine of qualified or "good faith" immunity extended to a municipal police officer performing a discretionary function. See Roden v. Wright, 646 So.2d 605 (Ala. 1994); PointProperties, Inc. v. Anderson, 584 So.2d 1332 (Ala. 1991), discussing, among other cases, Harlow v. Fitzgerald, supra. In deciding whether a public official, such as a police officer, is entitled to qualified immunity in a § 1983 action, this Court employs the following two-step analysis:
 " '1) The defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."
 " '2) Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions "violated clearly established constitutional law." ' "
646 So.2d at 610, quoting Rich v. Dollar, 841 F.2d 1558,1563-64 (11th Cir. 1988). (Citations omitted.) In PointProperties v. Anderson, supra, at 1338-39, this Court, quotingStewart v. Baldwin County Board of Education, 908 F.2d 1499,1503 (11th Cir. 1990), explained that " 'the relevant question on a motion for summary judgment based on a defense of qualified immunity is whether a reasonable official could have believed his or her actions were lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred.' " This Court went on to note that " 'the qualified immunity defense provides ample protection to all except the plainly incompetent or those who knowingly violate the law.' " 584 So.2d at 1339, quotingStewart, supra. Even viewing the evidence in the light most favorable to Couch, as we are required to do under our summary judgment standard of review, we conclude that Lesley was engaged in a discretionary function when he arrested Couch and, as previously noted, that he could have reasonably believed he was acting lawfully when he arrested Couch. The Court of Criminal Appeals, in Hardeman v. State, 651 So.2d 59, 67-68
(Ala.Crim.App. 1994), noted:
 " 'A person commits the crime of public intoxication if he appears in a public place under the influence of alcohol, narcotics or other drug to the degree that he endangers himself or another person or property, or by boisterous and offensive conduct annoys another person in his vicinity.' Ala. Code 1975, § 13A-11-10(a). Although the evidence presented by the State may not have been sufficient to sustain a conviction for public intoxication, that same evidence was sufficient to provide the officers with probable cause to arrest the appellant for that offense. See Parks v. Director, State Department of Public Safety, 592 So.2d 1066, 1067 (Ala.Civ.App. 1992) ('[a]n acquittal in a DUI case [is] not synonymous with an unlawful arrest'; 'there [may] be a lawful arrest even though there is a finding of "not guilty" of the offense charged'). ' "Probable cause" does not mean that the officers must possess enough evidence in admissible form to convict the person whom they arrest or search.' Yeager v. State, 281 Ala. 651, 653, 207 So.2d 125, 127 (1967), quoting Patenotte v. United States, 266 F.2d 647 (5th Cir. 1959).
 " 'Probable cause exists if facts and circumstances known to the arresting officer are sufficient to warrant a person of reasonable caution to believe that the suspect has committed a crime. "In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act. . . ." " 'The substance of all the definitions of probable cause is a reasonable ground for belief of guilt.' " "Probable cause to arrest is measured against an objective standard and, if the standard is met, it is unnecessary that the officer subjectively believe that he *Page 156 
has a basis for the arrest." The officer need not have enough evidence or information to support a conviction in order to have probable cause for arrest. Only a probability, not a prima facie showing, of criminal activity is the standard of probable cause.'
 "Dixon v. State, 588 So.2d 903, 906 (Ala. 1991) (citations omitted), cert. denied, 502 U.S. 1044, 112 S.Ct. 904, 116 L.Ed.2d 805 (1992). An officer need not have enough evidence or information to support a conviction to have probable cause to arrest. See Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879
(1949). '[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.' Spinelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637
(1969)."
Notwithstanding the fact that Couch was later acquitted of the public intoxication charge, the following undisputed facts, which were known to Lesley on the morning of the arrest, are sufficient to extend qualified immunity to Lesley: 1) The Stagecoach lounge was a known hangout for drug users and drug traffickers; 2) Sheffield police officers had been called to the lounge many times to deal with intoxicated patrons, to investigate property damage, etc.; 3) the owner of the lounge had requested that Sheffield police officers keep a close watch on his premises; 4) Lesley observed Couch and Berryman outside the lounge in an area where Lesley knew, from past experience, drug using and dealing had gone on before; 5) Couch's eyes were glazed and red and he appeared unbalanced and nervous during his conversation with Lesley outside the lounge; 6) Couch was directly beside and conferring with Berryman, who was heavily intoxicated and smelled of marijuana. From Lesley's perspective, Couch appeared to smell of, and to be high on, marijuana, in the middle of the night, at a lounge with a history of disturbances by intoxicated patrons, and he appeared to pose a danger to himself, to someone else at the lounge, or to someone's property. Couch's version of the incident is not sufficient, standing alone, to create a fact question as to whether Lesley could have reasonably believed that Couch had committed a crime and, thus, to take Lesley out from under the protection of the qualified immunity doctrine.
We further note that the City could not be held vicariously liable under § 1983 for Lesley's actions, see Monell v.Department of Social Services of the City of New York, supra;Polk County v. Dodson, 454 U.S. 312, 102 S.Ct. 445,70 L.Ed.2d 509 (1981), and that there is no credible evidence from which one could reasonably infer that Lesley violated Couch's civil rights pursuant to some official policy sanctioned by the City. See Monell, 436 U.S. at 691, 98 S.Ct. at 2036 ("Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort"). Bare speculation that the City was involved in fabricating evidence and suborning perjury, or that it was involved in a conspiracy to deny constitutional rights and obstruct justice, within the meaning of § 1985, simply will not suffice.
For the foregoing reasons, the summary judgment for the defendants is affirmed.
AFFIRMED.
HOOPER, C.J., and COOK and SEE, JJ., concur.
ALMON, J., concurs in the result.
[1] We note a discrepancy between the dates stated in the affidavits of the police officers and the dates stated by Couch in his statement of claim filed with the city clerk. This discrepancy is of no consequence for the purposes of this appeal.
[2] This man's last name also appears in the record as "Berriman."
[3] The complaint does not clearly indicate whether Couch sought to predicate liability on the City for Lesley's actions under the doctrine of respondeat superior; however, for purposes of this appeal, we assume that he did.
[4] "False imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." Ala. Code 1975, § 6-5-170. For there to be a false imprisonment, there must be some direct restraint of the person; however, it is not necessary that there be confinement in a jail, although detention and confinement in jail formed the basis of Couch's false arrest/imprisonment claim. Crown Central Petroleum Corp. v. Williams, 679 So.2d 651
(Ala. 1996). Any factual issues surrounding the training, supervising, and disciplining of Lesley; the "strip search"; or the question whether Lesley had probable cause to arrest Couch, were subject to consideration by a jury in a civil action.Crown Central Petroleum Corp., supra; Lindsey v. Camelot Music,Inc., 628 So.2d 314 (Ala. 1993).
[5] Of course, Couch could not have filed an action alleging malicious prosecution until his acquittal of the public intoxication charge in municipal court. See Barrett Mobile HomeTransport, Inc. v. McGugin, 530 So.2d 730 (Ala. 1988) (resolution of the criminal charge in the plaintiff's favor is a prerequisite to a cause of action for malicious prosecution). However, as noted previously, the City had immunity under §11-47-190 with respect to Couch's malicious prosecution claim. See Scott v. City of Mountain Brook, supra, 602 So.2d at 894 ("[w]e have emphasized that a claim of malicious prosecution against a municipality . . . is not within the 'neglect, carelessness or unskillfulness' genre of liability").