904 So.2d 314 (2004)
Sherry THURMOND et al.
v.
CITY OF HUNTSVILLE et al.
No. 2010557.
Court of Civil Appeals of Alabama.
March 26, 2004.
Certiorari Quashed December 30, 2004.
*315 Henry F. Sherrod III, Florence, for appellants.
George W. Royer, Jr., of Lanier Ford Shaver & Payne, P.C., Huntsville, for appellee City of Huntsville.
Michael L. Fees and C. Gregory Burgess of Fees & Burgess, P.C., Huntsville, for appellees Lieutenant Daniel Della-Calce, Officer Tommy Mayo, Officer Paul Jones, and Officer Mike Culbreath.
Alabama Supreme Court 1031070.
*316 THOMPSON, Judge.[1]
This appeal challenges the trial court's entry of a summary judgment in favor of the City of Huntsville and four police officers of the Huntsville Police Department ("HPD")  Lieutenant Daniel Della-Calce, Officer Tommy Mayo, Officer Paul Jones, and Officer Mike Culbreath  on the "negligent-and-intentional assault and battery claims"[2] asserted against them by Sherry Thurmond, Levon Hall, Ronnie Hopper, David Rollins, and Rollins Thompson (hereinafter referred to collectively as "the plaintiffs"). Although the trial court's judgment did not contain any findings of facts or conclusions of law, it was entered in response to motions for a summary judgment filed by the City of Huntsville and the police officers asserting among other things, the defense of discretionary-function immunity. In essence, the trial court, by entering a summary judgment in favor of the City Of Huntsville and the police officers, determined that the police officers were entitled to discretionary-function immunity pursuant to § 6-5-338(a), Ala.Code 1975, and then extended that immunity to the City of Huntsville, pursuant to § 6-5-338(b), Ala.Code 1975. The plaintiffs appealed to the supreme court; that court transferred the case to this court, pursuant to § 12-2-7(6), Ala.Code 1975.
The incident giving rise to the plaintiffs' negligence and assault-and-battery claims occurred during a confrontation between members of the Mobile Field Force ("MFF") of the HPD and a large crowd of striking unionized rubber workers, of which the plaintiffs were members, outside the entrance of the Dunlop Tire Company plant ("the Dunlop plant") in Huntsville. The relevant facts are essentially undisputed. The record in this case is voluminous, including all or part of the deposition transcripts of 28 witnesses, which constitute the bulk of the 9-volume record and thousands of pages of testimony. The record also includes videotape recordings of the events giving rise to the plaintiffs' claims. In fact, the record includes several videotapes recorded from different vantage points by different parties, including a cameraman employed by a Huntsville television station, a videographer located inside the MFF formation, a member of the union that had organized the strike that led to the events in question, and a Dunlop employee.
On September 6, 1994, the MFF, consisting of approximately 40 police officers, was mobilized to the Dunlop plant in the early morning hours at approximately 3:40 a.m. to monitor an ongoing union strike.[3] A large crowd of striking workers had assembled to show "unity and solidarity" and to intimidate those who they called "scabs," the nonstriking Dunlop workers, from crossing the picket line and returning to work at the Dunlop plant. The striking workers became disorderly and violent and threw rocks and other objects at automobiles driving by on the street and entering *317 the Dunlop plant site. The crowd's violent behavior caused personal injuries and at least 91 incidents of property damage; those affected by the crowd's violent behavior included not only the nonstriking Dunlop workers who were attempting to cross the picket line and return to work at the plant, but also other individuals on their way to work at the Intergraph plant located in the vicinity of the Dunlop plant.
In response to the striking workers' violent behavior, Lieutenant Della-Calce, the on-site MFF commander, broadcast a dispersal order over a bullhorn at approximately 5:45 a.m. Lieutenant Della-Calce informed the crowd that their assembly had been declared an unlawful assembly and that they would be arrested if they did not disperse. Although some of the striking workers began to leave, the crowd did not fully disperse. Lieutenant Della-Calce then ordered the MFF officers to begin marching toward the crowd at a "half-step" pace to encourage the crowd to further disperse. Shortly thereafter, Lieutenant Della-Calce ordered  communicated by two sound blasts over the air horn  the front-line officers (which included Officer Mayo, Officer Jones, and Officer Culbreath) to begin marching while tapping their shields with their batons to further encourage the crowd to disperse. The plaintiffs emerged from the crowd and positioned themselves directly in front of the marching MFF officers, about 20 yards in front of the other striking workers. Thurmond, Hall, and Hopper sat on the ground; Thompson and Rollins stood next to Thurmond, Hall, and Hopper. At this point, the crowd still had yet to fully disperse and some members of the crowd actually slowed their departure to observe what the plaintiffs were doing. As the MFF officers got closer, Lieutenant Della-Calce ordered  communicated by the issuance of three sound blasts over the air horn  the front-line officers to swing their batons out in front of their shields at a waist level or lower are (a common police tactic to encourage crowd dispersal) as an additional show of force to further encourage the crowd to leave. One of the videotapes shows that the plaintiffs were in close proximity to one another; although Thurmond, Hall, and Hopper sat on the ground with their backs to the advancing MFF, at least one of them looked backwards to observe the progress of the advancing MFF. When the MFF officers neared the plaintiffs' position, the front-line officers continued swinging their batons and yelled at the plaintiffs to move or they would be struck. The plaintiffs did not move, and as the front-line officers continued to march past the plaintiffs, the front-line officers struck the plaintiffs with their batons. The two officers who struck the standing plaintiffs, Thompson and Rollins, were not named as defendants in the lawsuit; the evidence indicates that Officer Mayo struck Thurmond, Officer Culbreath struck Hall, and Officer Jones struck Hopper. Upon being struck, Thompson and Rollins rejoined the crowd. Thurmond, Hall, and Hopper did not retreat and were arrested by the MFF arrest teams that were positioned immediately behind the MFF front-line officers. Thurmond, Hall, and Hopper were subsequently found guilty of disorderly conduct under § 13A-11-7(a)(6), Ala.Code 1975.

Federal Action
Based on the above-detailed incident, the plaintiffs filed an action in the United States District Court for the Northern District of Alabama, alleging, among other things, that Lieutenant Della-Calce's order to the front-line officers to go into "swinging baton" mode constituted excessive use of force, pursuant to 42 U.S.C. § 1983. The plaintiffs sued Lieutenant Della-Calce, as well as Officer Mayo, Officer Jones, and Officer Culbreath, alleging *318 supplemental state-law claims of assault and battery. The plaintiffs also named the City of Huntsville as an additional defendant under both claims.
The case was assigned to a magistrate judge with the consent of the parties, pursuant to 28 U.S.C. § 636(c)(1). The City of Huntsville and the police officers filed motions for a summary judgment. Thereafter, the magistrate judge entered an order granting the City of Huntsville's summary-judgment motion on the § 1983 excessive-force claim but denying the City's summary-judgment motion as to the plaintiffs' assault-and-battery claims. The magistrate judge denied the summary-judgment motions filed by the police officers; the magistrate judge declined to find that Lieutenant Della-Calce was protected by qualified immunity as to plaintiffs' § 1983 excessive-force claim and declined to find that the police officers were protected by discretionary-function immunity, as provided by § 6-5-338(a), as to plaintiffs' supplemental state-law assault-and-battery claims.
The police officers appealed to the United States Court of Appeals for the Eleventh Circuit. In an unpublished opinion, the Eleventh Circuit Court of Appeals held that the magistrate judge had erred by withholding qualified immunity from Lieutenant Della-Calce as to the plaintiffs' excessive-force claim; the Eleventh Circuit Court of Appeals reversed the judgment and remanded the case with instructions that a final summary-judgment be entered in favor of Lieutenant Della-Calce as to that claim. Thurmond v. City of Huntsville, (No. 99-13960, Dec. 12, 2000), 244 F.3d 140 (11th Cir.2000) (table). In reaching its decision, the Eleventh Circuit Court of Appeals found that "there can be little doubt that Lieutenant Della-Calce was acting within the scope of his discretionary authority at the time he ordered the front-line officers to move forward in a `swinging baton' mode" and that the plaintiffs failed to prove that Lieutenant Della-Calce's order to the front-line officers to move forward in a "swinging baton" mode constituted a "violation of `clearly established law.'" Regarding the supplemental state-law assault-and-battery claims, the Eleventh Circuit Court of Appeals directed the magistrate judge to dismiss those claims without prejudice so they could be pursued in state court.

State-Court Action
After the magistrate judge dismissed the plaintiffs' state-law claims against the City of Huntsville and the police officers without prejudice, the plaintiffs filed the present action in the Madison Circuit Court. Among other things, Thurmond, Hall, and Hopper alleged that Lieutenant Della-Calce, and Officer Mayo, Officer Jones, and Officer Culbreath were liable to them for "negligent or intentional assault and battery." Thompson and Rollins likewise alleged that Lieutenant Della-Calce was liable to them for negligent or intentional assault and battery. The plaintiffs later filed their first amended complaint in this action in which they named the City of Huntsville as an additional defendant.[4] The police officers filed a motion to dismiss. Thereafter, the plaintiffs filed a second amended complaint in which, among other things, they added allegations that the defendants' conduct had been negligent, intentional, willful, malicious, or in bad faith. The Madison Circuit Court entered an order dismissing all claims alleging negligence against Officer Mayo, Officer Jones, and Officer Culbreath, but it otherwise denied the police officers' motion to dismiss.
*319 All of the defendants subsequently filed motions for a summary judgment. After conducting a hearing, the trial court granted the motions for a summary judgment of all the defendants.

Standard of Review
It is well settled under Alabama law that the party moving for a summary judgment must make a prima facie showing "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c)(3), Ala. R. Civ. P. If the moving party meets its burden, "`the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact.'" Cremeens v. City of Montgomery, 779 So.2d 1190, 1191 (Ala.2000) (quoting Machen v. Childersburg Bancorporation, Inc., 761 So.2d 981, 984 (Ala.1999)). Evidence is substantial if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). In reviewing a motion for a summary judgment, the court must view the evidence in a light most favorable to the nonmoving party and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala.1990).

Discretionary-Function Immunity under § 6-5-338(a)
Section 6-5-338(a) "shields police officers from tort liability for discretionary acts performed `within the line and scope of [their] law-enforcement duties.'" Norris v. City of Montgomery, 821 So.2d 149, 153 (Ala.2001) (quoting § 6-5-338(a)). Section 6-5-338(a) provides, in pertinent part:
"(a) Every peace officer, ... whether appointed or employed as such peace officer by the state or a county or municipality thereof, ... shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."
(Emphasis added.)
Our supreme court has defined discretionary functions[5] as "`those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances.'" Ex parte City of Gadsden, 781 So.2d 936, 938 (Ala.2000) (quoting Wright v. Wynn, 682 So.2d 1, 2 (Ala.1996)). "`[E]xercising judgment in the enforcement of the criminal laws of the State,' ... is a recognized discretionary function." Ex parte Tuscaloosa County, 796 So.2d 1100, 1106 (Ala.2000) (quoting Ex parte Cranman, 792 So.2d 392, 405 (Ala.2000)). Our supreme court has also held that "acts taken in bad faith, or willful or malicious conduct, will not be considered discretionary in nature." Ex parte City of Montgomery, 758 So.2d 565, 569 (Ala.1999) (citing Couch v. City of Sheffield, 708 So.2d 144, 153 (Ala.1998)); see Wright v. Wynn, supra; Barnes v. Dale, 530 So.2d 770 (Ala.1988); DeStafney v. University of Alabama, 413 So.2d 391 (Ala.1981).
*320 Thus, the first step in analyzing whether a police officer's conduct is protected by the doctrine of discretionary-function immunity under § 6-5-338(a) is to determine whether the police officer was performing a discretionary function. Ex parte City of Gadsden, 781 So.2d at 938. Upon that showing, the burden shifts to the plaintiffs to present substantial evidence tending to show that the police officer's conduct was "so egregious as to amount to willful or malicious conduct or conduct engaged in in bad faith." Couch v. City of Sheffield, 708 So.2d at 153; Wright v. Wynn, supra. See also Ex parte Tuscaloosa County, 796 So.2d at 1106 (quoting Ex parte Cranman, 792 So.2d at 402). Accord, Lee v. Minute Stop, Inc., 874 So.2d 505 (Ala.2003).
In any discretionary-function immunity case, courts must make a "pragmatic assessment of what, if any, degree of immunity is necessary to enable the particular governmental function to be effectively performed." Bell v. Chisom, 421 So.2d 1239, 1241 (Ala.1982). With regard to police officers performing their law-enforcement duties, our supreme court has stated that discretionary-function immunity must exist because a police officer should not be required "to ponder and ruminate over decisions that should be made in a split second." White v. Birchfield, 582 So.2d 1085, 1087 (Ala.1991). Our supreme court has also stated that the grant of discretionary-function immunity is justified by "`[t]he need to attract and keep capable [police] officers, the allocation of scarce resources for law enforcement, and the need for officers to make decisions based on the requirements of the circumstances rather than on their potential for personal liability.'" Nunnelee v. City of Decatur, 643 So.2d 543, 546 (Ala.1993) (quoting Thetford v. City of Clanton, 605 So.2d 835, 843 (Ala.1992)). In addition, it has been held that the shield of discretionary-function immunity is "`particularly applicable'" where "`[a police] officer is required to make difficult decisions on the spur of the moment'" while performing his law-enforcement duties, Nunnelee, 643 So.2d at 546 (quoting Thetford, 605 So.2d at 843), and in situations where a police officer responds to a "life-threatening situation," Birchfield, 582 So.2d at 1087. More recently, it has been held that discretionary-function immunity applies when a police officer is required to make "difficult split-second decision[s] under unusual circumstances." Ex parte City of Gadsden, 781 So.2d at 940.
Under Alabama law, a police department's policies may grant a police officer discretion to act in a particular manner. Ex parte City of Gadsden, 781 So.2d at 938-40. Similarly, a statute or a police department's policies may eliminate a police officer's discretion to act in a particular manner. Williams v. Crook, 741 So.2d 1074 (Ala.1999) (statute), and Ott v. City of Mobile, 169 F.Supp.2d 1301, 1317 (S.D.Ala.2001) (police department policy).

Lieutenant Della-Calce
The plaintiffs contend that Lieutenant Della-Calce's decision to order the MFF to march toward the crowd and his subsequent decision to order the front-line officers into "swinging baton" mode were not protected by the doctrine of discretionary-function immunity under § 6-5-338(a) because, they claim, Lieutenant Della-Calce's discretionary authority to make those decisions was eliminated by HPD policy, and, therefore, the plaintiffs allege, he was not engaged in a discretionary function.[6] We disagree.
*321 The plaintiffs refer this court to four HPD policies in support of this contention. The plaintiffs first contend that HPD Written Directive 406.3, "Civil Disorders," paragraph 10, "Tactics," subsection D, "Offensive Movement," eliminated Lieutenant Della-Calce's discretionary authority to order the MFF to march toward the crowd; that directive states, in pertinent part: "When conditions make the use of chemical agents unfeasible or ineffective, the crowd may still have to be dispersed. Movement of the Field Force is the last alternative." The plaintiffs claim that it was feasible to disperse the crowd by using tear gas and that "while [Lieutenant Della-Calce] had discretion concerning whether, when, and how to arrest plaintiffs, this case is about the one thing he did not have discretion to do  order that the MFF march into passively-resisting plaintiffs while swinging their batons when it was feasible to use tear gas to disperse them."
It is undisputed that Lieutenant Della-Calce was the on-site MFF commander at the Dunlop plant on September 6, 1994, and that he had the responsibility and authority to determine how to disperse the crowd of striking workers and how to arrest any striking workers who refused to disperse. As previously stated, "`[e]xercising judgment in the enforcement of the criminal laws of the State,' ... is a recognized discretionary function." Ex parte Tuscaloosa County, 796 So.2d at 1106 (quoting Ex parte Cranman, 792 So.2d at 405). Lieutenant Della-Calce testified that he did not choose to use tear gas "because under the circumstances that [he] was confronted with, [he] did not choose that as the option at the time." Lieutenant Della-Calce further testified that he considered using tear gas but decided that it was not feasible or effective under the circumstances.
In Ex parte City of Gadsden, supra, the plaintiff contended that the police officer's "failure to secure the accident scene in accordance with departmental regulations amounted to negligence in performing a ministerial act [and,] therefore, ... [the officer] was not protected by the doctrine of discretionary-function immunity." 781 So.2d at 938. The police officer had left the scene of an accident to pursue a possibly intoxicated driver who had left the scene on foot. At the accident scene, a chain-link fence had been knocked down and dragged into the street. After the officer had left the scene, a vehicle came along, striking the fence and causing the plaintiff to become entangled in the fence and sustain leg injuries. The plaintiff sued the officer and the City of Gadsden, alleging that the officer had negligently left the scene without securing the scene in violation of written police department policies. The police department policies required the first officer on the scene to "`park the patrol vehicle in such a manner as to protect the scene, preserve evidence and protect the public [and] establish a safe traffic pattern around the scene.'" 781 So.2d at 939 (capitalization omitted). The policies *322 further required that if an officer observed a hazardous roadway condition, the officer was required to "`protect the scene and bystanders and direct traffic or take any other action deemed necessary to correct and/or protect the situation until assistance arrives.'" Id. (capitalization omitted).
The police department policies also directed the officer to use his discretion and judgment in carrying out his duties. The general traffic-enforcement policy stated that an "`officer must decide what enforcement action is proper based on a combination of training, experience and common sense.'" Id. (capitalization and emphasis omitted). The hazardous-roadway-conditions policy required the officer to form an "`opinion'" that "`such hazard requires immediate correction.'" Id. (capitalization and emphasis omitted). In Ex parte City of Gadsden, our supreme court held that because of the discretion given to the officer under the department policies the police officer was engaged in the exercise of a discretionary function, noting that the officer "was faced with a situation for which there was no hard and fast set of rules" and that the officer's "duties as a law-enforcement officer required him to make a difficult split-second decision under unusual circumstances." 781 So.2d at 940. Because the officer's decision to pursue the suspect, instead of securing the scene, required an "`exercise in judgment and choice and [involved] what [was] just and proper under the circumstances,'" the officer was engaged in the performance of a discretionary function and was entitled to discretionary-function immunity under § 6-5-338(a). Id. (quoting Wright, 682 So.2d at 2).
In this case, as in Ex parte City of Gadsden, the police department policies granted Lieutenant Della-Calce authority to engage in a discretionary function by requiring him to "`exercise in judgment and choice ... what [was] just and proper under the circumstances.'" 781 So.2d at 940 (quoting Wright, 682 So.2d at 2). Likewise in the case before us, Lieutenant Della-Calce was specifically granted discretion under HPD Written Directive 406.3, "Civil Disorders," paragraph 10, "Tactics," subsection D, "Offensive Movement," to order the MFF to march toward the crowd if he determined that the use of tear gas was not feasible or effective; that directive does not create a "`hard and fast rule as to the course of conduct that one must or must not take'" so as to eliminate any "`exercise in judgment and choice.'" Ex parte City of Gadsden, 781 So.2d at 938 (quoting Wright, 682 So.2d at 2). Lieutenant Della-Calce was required to make a difficult split-second decision under unusual circumstances that required "`an exercise in judgment and choice and [involved] what [was] just and proper under the circumstances.'" 781 So.2d at 940 (quoting Wright, 682 So.2d at 2). The plaintiffs have failed to point to a "hard and fast rule" to determine when the use of tear gas is feasible and effective and when it is not. While the plaintiffs attempt to argue the feasibility of using tear gas to disperse the crowd, their argument fails to address the fact that HPD Written Directive 406.3, "Civil Disorders," paragraph 10, "Tactics," subsection D, "Offensive Movement," granted Lieutenant Della-Calce discretion to exercise his judgment in determining what was just and proper under the circumstances. Based on Ex parte City of Gadsden, we conclude that HPD Written Directive 406.3, "Civil Disorders," paragraph 10, "Tactics," subsection D, "Offensive Movement," did not eliminate Lieutenant Della-Calce's discretionary authority to order the MFF to *323 march toward to the crowd of striking workers.[7]
Next, the plaintiffs contend that subparagraph 4 of subsection D, "Offensive Movement," of paragraph 10, "Tactics," of HPD Written Directive 406.3, "Civil Disorders," eliminated Lieutenant Della-Calce's discretion to order the front-line officers into "swinging baton" mode; that directive states:
"If the crowd is hostile, refuses to disperse, and continues to physically assault the Field Force members or civilians, the Field Force Commander will issue three blasts on the air horn. On the third blast, the Field Force will approach the crowd in formation, carrying protective shields and swinging the PR-24's [the officers' batons] in front of them in a low (waist-level or lower) are."
The plaintiffs contend that after the MFF began marching toward the crowd, the crowd ceased to be violent and was no longer physically assaulting civilians or the police. Some of the MFF officers, including Lieutenant Della-Calce, testified that objects were thrown at them after the MFF fell into line formation and began marching toward the crowd of striking workers. Although some police officers stated that they did not observe objects being thrown during this time period, their testimony does not necessarily contradict the testimony of those who did. Although the exact timing of when the objects were thrown at the MFF is disputed by the plaintiffs, we do not conclude that that factor alone stripped Lieutenant Della-Calce of his discretionary authority. Based on Ex parte City of Gadsden, we conclude that subparagraph 4 of subsection D, "Offensive Movement," of paragraph 10, "Tactics," of the HPD Written Directive 406.3, "Civil Disorders," did not eliminate Lieutenant Della-Calce's discretionary authority to order the MFF into "swinging baton" mode.
The plaintiffs also contend that HPD Written Directive 406.3, "Civil Disorders," paragraph 10, "Tactics," subsection A, "Crowd Control," subparagraph 12, combined with HPD Written Directive 101.13, "Use of Force" (which is incorporated into HPD Written Directive 406.3, "Civil Disorders"), paragraph 10, "Use of Force: Impact/Intermediate Weapons (Non-lethal)," subsection B, subparagraph 1, eliminated Lieutenant Della-Calce's discretion to order the front-line officers into "swinging baton" mode. HPD Written Directive 406.3, "Civil Disorders," paragraph 10, "Tactics," subsection A, "Crowd Control," subparagraph 12, states: "Regardless of the nature of the crowd, limit the use of force as much as possible without placing the safety of police personnel in jeopardy." HPD Written Directive 101.13, "Use of Force," paragraph 10, "Use of Force: Impact/Intermediate Weapons (Non-lethal)," subsection B, subparagraph 1, states:
"The PR-24 baton may be used when force is necessary and
"1. When the officer reasonably believes empty hand techniques will or have failed but an escalation to deadly force is not justified."[8]
The plaintiffs contend that "empty-hand techniques" had not failed and that the conduct of the plaintiffs did not justify the *324 use of an impact weapon. However, the plaintiffs failed to point out subparagraphs 3 and 4 of that same directive, which states:
"The PR-24 baton may be used when force is necessary and
"....
"3. As a repelling device in crowd control situations or to ward off blows from an assailant, or
"4. In a show of force within the ranks of a Mobile Field Force in crowd control situations."
Based on Ex parte City of Gadsden, we do not conclude that HPD Written Directive 406.3, "Civil Disorders," paragraph 10, "Tactics," subsection A, "Crowd Control," subparagraph 12, combined with HPD Written Directive 101.13, "Use of Force," paragraph 10, "Use of Force: Impact/Intermediate Weapons (Non-lethal)," subsection B, subparagraph 1, eliminated Lieutenant Della-Calce's discretionary authority to order the MFF into "swinging baton" mode.
Accordingly, Lieutenant Della-Calce made a prima facie showing that the defense of discretionary-function immunity barred the plaintiffs' claims against him. The plaintiffs failed to rebut that prima facie showing by presenting substantial evidence to show that Lieutenant Della-Calce's conduct was "so egregious as to amount to willful or malicious conduct or conduct engaged in in bad faith." Couch v. City of Sheffield, 708 So.2d at 153; Wright v. Wynn, supra. Therefore, the trial court's summary-judgment in favor of Lieutenant Della-Calce is due to be affirmed.

Officer Mayo, Officer Jones, and Officer Culbreath
The plaintiffs contend that the trial court erred in entering the summary judgment in favor of Officer Mayo, Officer Jones, and Officer Culbreath because, they say, if a jury believes that those officers were trained to walk around passive resistors and not to strike them, then those officers did not have discretion to strike Thurmond, Hall, and Hopper. The plaintiffs also contend that viewing the evidence in the light most favorable to them, it has to be assumed that the plaintiffs remained passive, and, therefore, they claim, there was no judgment call for those officers to make regarding whether to strike the plaintiffs with their batons. We disagree.
The affidavits of Officer Mayo, Officer Jones, and Officer Culbreath establish, without contradiction by the plaintiffs, the following material facts.[9]
"Before the riot at the Dunlop plant that occurred on September 6, 1994, the MFF had received training in various areas, including crowd control tactics. One of the crowd control tactics which was practiced consisted of the MFF marching forward as a unit toward a simulated crowd of demonstrators at a half-step pace. At times during this training exercise, the front line officers were given a command by the Field Force Commander to continuously swing their batons out in front of their protective shields at a waist-level or lower arc. This `swinging-baton' tactic was designed to create a visual show of force by the MFF to encourage the crowd of demonstrators to voluntary disperse without the need for any unnecessary physical confrontation between the MFF and individual demonstrators.

*325 "Before the riot at the Dunlop plant occurred on September 6, 1994, the front line officers of the MFF were never trained to strike any passively-resisting demonstrators while marching in swinging baton mode. Instead, if the MFF encountered one or more passive demonstrators while marching forward, the front line officers were specifically trained in this situation to continue swinging their batons but to march around any of these individuals. On the other hand, if the MFF encountered one or more aggressive demonstrators, the front line officers were allowed to use force as to these demonstrators. In assessing whether the demonstrator was passive or aggressive, whether to use force with regard to an aggressive demonstrator, and what amount of force was reasonable and necessary under the circumstances, the front line officers were trained to make these decisions for themselves, exercising their own independent judgment and discretion based on the circumstances confronting them at the time. After the front line officers passed by the demonstrators, the arrest team officers of the MFF, who typically were positioned immediately behind the front line officers, would then effect the arrests of all demonstrators who refused to disperse.
"During the deployment of the MFF at the Dunlop plant on September 6, 1994, [the front line officers of the MFF were] given a command by the Field Force Commander, Lieutenant Daniel Della-Calce, to march forward in swinging-baton mode as the MFF approached the crowd of strikers. Consistent with [their] training, [the officers used their] own independent judgment and discretion while marching in swinging-baton mode to assess whether any of the strikers that [they personally confronted] was passive or aggressive and also whether any of the strikers otherwise posed a threat to either [themselves] or the other members of the MFF. [The officers] had to make these assessments under tense, rapidly-evolving, and potentially life-threatening circumstances."[10]
Thus, in carrying out Lieutenant Della-Calce's order to move forward in "swinging baton" mode during the course of the Dunlop riot, it was necessary for the front-line officers, by virtue of their previous training, to make a judgment call as to whether the plaintiffs were "passively" or "actively" resisting and, if it was determined that the plaintiffs were engaged in active resistance, whether to use force with regard to the plaintiffs. The plaintiffs' contention overlooks the fact that, in performing their duties as members of the MFF, the MFF front-line officers were required to make decisions, on a split-second basis, as to the level of resistence offered by the plaintiffs and also had to use their independent judgment to determine what amount of force was appropriate under the circumstances to respond to such resistence. As previously stated, "`[e]xercising judgment in the enforcement of the criminal laws of the State,' ... is a recognized discretionary function." Ex parte Tuscaloosa County, 796 So.2d at 1106 (quoting Ex parte Cranman, 792 So.2d at 405); see also City of Birmingham v. Sutherland, 834 So.2d 755, 762 (Ala.2002) (granting a police officer discretionary-function immunity for his decision to make a warrantless arrest and for a *326 determination as to "the manner in which he would effect the arrest").
Additionally, in making the determination described above, Officer Mayo, Officer Jones, and Officer Culbreath were exercising discretion specifically delegated to them under HPD policy. HPD Written Directive 101.21, "Limits of Authority," paragraph 7, "Use of Discretion," subsection A, states: "Officers of the [HPD] are cautioned to use discretion in the performance of their assigned tasks, taking into consideration the conditions present at the time, the constraints of existing policy, statutes, laws and/or ordinances pertaining to the situation, and the available alternatives." Given the interplay between this directive and the ones cited earlier in this opinion, as well as the training of these police officers as members of the MFF front line not to strike "passive" resisters, we conclude that the front-line officers were engaged in the exercise of a discretionary function on the occasion at issue when they made the judgment call on how much force to use and under what circumstances to use it. The types of decisions the front-line officers were forced to make are precisely the "split-second decision[s] under unusual circumstances" that our supreme court in Ex parte City of Gadsden recognized as the types of decisions involving the exercise of a discretionary function for which the officers were entitled to discretionary-function immunity. 781 So.2d at 940.
Accordingly, Officer Mayo, Officer Jones, and Officer Culbreath made a prima facie showing that the defense of discretionary-function immunity barred the plaintiffs' claims against them. The plaintiffs failed to rebut that prima facie showing by presenting evidence tending to show that the conduct of Officer Mayo, Officer Jones, and Officer Culbreath was "so egregious as to amount to willful or malicious conduct or conduct engaged in in bad faith." Couch v. City of Sheffield, 708 So.2d at 153; Wright v. Wynn, supra. After reviewing the record, including the videotapes depicting the confrontation that is the basis of this action, we conclude that Officer Mayo, Officer Jones, and Officer Culbreath did not act beyond the scope of their discretionary authority in light of the facts and circumstances confronting them at that time. The front-line officers were charged with controlling a large crowd that had been told to disperse and that had been previously engaged in rock throwing at numerous moving vehicles, thereby endangering the safety of the general public. The actions of Officer Mayo, Officer Jones, and Officer Culbreath as shown on the videotapes contradicts any suggestion of willful or malicious conduct or bad faith on the part of those front-line officers. Given the facts and circumstances surrounding the actions of Officer Mayo, Officer Jones, and Officer Culbreath, the trial court's summary judgment in favor of Officer Mayo, Officer Jones, and Officer Culbreath is due to be affirmed.

City of Huntsville
Our holding with regard to the individual defendants also disposes of the claims against the City of Huntsville because the plain language of § 6-5-338 extends discretionary-function immunity to the municipality. Subsection (b) of § 6-5-338 provides, in pertinent part, that "[t]his section [§ 6-5-338] is intended to extend immunity only to peace officers and governmental units ... authorized to appoint peace officers." In Ex parte City of Gadsden, our supreme court held that because the police officer was performing a discretionary function under § 6-5-338(a), "[t]he plain language of § 6-5-338(b), Ala.Code 1975, extends that discretionary-function immunity to the City." 781 So.2d at 940. Accord, Borders v. City of Huntsville, 875 *327 So.2d 1168 (Ala.2003); Sutherland, 834 So.2d at 762; Montgomery v. City of Montgomery, 732 So.2d 305, 312 (Ala.Civ.App.1999). Accordingly, because we conclude that Lieutenant Della-Calce, Officer Mayo, Officer Jones, and Officer Culbreath are shielded from liability by the doctrine of discretionary-function immunity under § 6-5-338(a), we also conclude that the City of Huntsville is shielded from vicarious liability for the actions of Lieutenant Della-Calce and Officer Mayo, Officer Jones, and Officer Culbreath under § 6-5-338(b). Therefore, the trial court's entry of a summary judgment in favor of the City of Huntsville is due to be affirmed.
The summary judgment in favor Lieutenant Della-Calce, Officer Mayo, Officer Jones, Officer Culbreath, and the City of Huntsville is due to be affirmed.
AFFIRMED.
YATES, P.J., and PITTMAN, J., concur.
MURDOCK, J., concurs in the result in part and dissents in part, with writing, which CRAWLEY, J., joins.
MURDOCK, Judge, concurring in the result in part and dissenting in part.
Based on the record before us, I must conclude that there exist genuine issues of fact that make summary judgment inappropriate in this case as to the front-line officers. Accordingly, while I concur in the result reached by the main opinion as to the other defendants, I dissent from the decision to affirm the summary judgment in favor of the front-line officers.
CRAWLEY, J., concurs.
NOTES
[1] This case was originally assigned to another judge on this court on May 28, 2002. It was reassigned to Judge Thompson on January 29, 2004.
[2] The plaintiffs contend that the City of Huntsville is liable only to the extent that the police officers acted negligently. Although the plaintiffs denominated their negligence-based claims as "negligent assault and battery" claims, those claims are subsumed within a single claim of negligence under § 11-47-190, Ala.Code 1975. See Hilliard v. City of Huntsville, 585 So.2d 889 (Ala.1991) (under § 11-47-190, negligence is the sole basis for liability against a municipality in Alabama).
[3] In addition to the MFF, approximately 15 officers had been assigned to "picket-line" security, and three officers had been deployed in vehicles to patrol Dunlop Boulevard.
[4] See note 2, supra.
[5] The supreme court has used the terms "discretionary functions" and "discretionary acts" interchangeably in defining what constitutes a "discretionary function" under § 6-5-338(a). See Telfare v. City of Huntsville, 841 So.2d 1222, 1228 (Ala.2002); City of Birmingham v. Sutherland, 834 So.2d 755, 759 (Ala.2002); Ex parte City of Gadsden, 781 So.2d 936, 938 (Ala.2000).
[6] The plaintiffs further contend that Lieutenant Della-Calce's supervisory position, as on-site commander of the MMF, did not cloak him with the protection of discretionary-function immunity. The plaintiffs also contend that, although the Eleventh Circuit Court of Appeals held that Lieutenant Della-Calce was entitled to qualified immunity from liability on the § 1983 federal excessive-force claim, that opinion did not necessarily resolve the factual issues relating to the issue of discretionary-function immunity under § 6-5-338(a) in Lieutenant Della-Calce's favor, and, therefore, the plaintiffs contend, they are not estopped to relitigate the factual issues in a collateral action such as this one. Because we conclude that Lieutenant Della-Calce was engaging in the exercise of discretionary functions when he ordered the MFF to march toward the crowd and when he ordered the MFF into "swinging baton" mode, we pretermit a discussion of those issues.
[7] We also note that the plaintiffs have failed to direct this court to a case in which a commanding police officer was held liable for the alleged tortious conduct of his subordinates.
[8] We note that both the use of tear gas and the use of batons are considered the fourth stage of force under HPD Written Directive 101.13, "Use of Force," paragraph D, subsection 4, "Impact/Intermediate Weapons."
[9] The affidavits of Officer Mayo, Officer Jones, and Officer Culbreath are virtually identical.
[10] Additionally, we note that Lieutenant Della-Calce, as well as Officer Mayo, Officer Jones, and Officer Culbreath, all answered "false" to the statement  "To strike a passive resister with an impact weapon is justified."  on the PR-24 Police Baton Basic Course test.