This appeal presents an issue of first impression: What is the effect on the immunity afforded peace officers by §6-5-338(a), Ala. Code 1975, of the conditions and limitations imposed on drivers of emergency vehicles by § 32-5A-7(b)(3) and (d), Ala. Code 1975?
Section 6-5-338(a) provides, in pertinent part:
 "Every peace officer. . . . shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."
 Section 32-5A-7 provides:
 "(a) The driver of an authorized emergency vehicle, when responding to an emergency call or when in the pursuit of an actual or suspected violator of the law or when responding to but not upon returning from a fire alarm, may exercise the privileges set forth in this section, but subject to the conditions herein stated.
 "(b) The driver of an authorized emergency vehicle may:
 "(1) Park or stand, irrespective of the provisions of this chapter;
 "(2) Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;
 "(3) Exceed the maximum speed limits so long as he does not endanger life or property;
 "(4) Disregard regulations governing direction of movement or turning in specified directions.
 "(c) The exemptions herein granted to an authorized emergency vehicle shall apply only when such vehicle is making use of an audible signal meeting the requirements of Section 32-5-213 and visual requirements of any laws of this state requiring visual signals on emergency vehicles.
 "(d) The foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others."
The underlying case arose from an April 24, 2002, collision between a patrol car being driven on an emergency run by Officer Steven Conner, a City of Hanceville police officer, and an automobile in which Luther Wilton Blackwood was a passenger. Blackwood suffered severe injuries as a result of the wreck and sued Conner and the City of Hanceville ("the City") in the Cullman Circuit Court, seeking compensatory damages on the theory that Conner's negligence and the City's negligent training and supervision of him caused the collision. In their answer to Blackwood's complaint, Conner and the City asserted immunity under § 6-5-338 and subsequently moved for a summary judgment predicated on that immunity. The Cullman Circuit Court initially denied the summary-judgment motion, but on the defendants' motion to alter, amend, or vacate that denial, the court entered a summary judgment for Conner and the City. Blackwood appeals.
 Standard of Review
"`We review a summary judgment de novo.' Potter v. FirstReal Estate Co., 844 So.2d 540, 545 (Ala. 2002) (citation omitted). `Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a *Page 499 
judgment as a matter of law."' Ex parte Rizk,791 So.2d 911, 912 (Ala. 2000) (citations omitted).
 "`In determining whether the nonmovant has created a genuine issue of material fact, we apply the "substantial-evidence rule" — evidence, to create a genuine issue of material fact, must be "substantial."' § 12-21-12(a), Ala. Code 1975. "Substantial evidence" is defined as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989).'
 "Callens v. Jefferson County Nursing Home, 769 So.2d 273, 278-79 (Ala. 2000) (footnote omitted). In deciding a motion for a summary judgment, or in reviewing a summary judgment, the court must accept the tendencies of the evidence most favorable to the nonmoving party and must resolve all reasonable factual doubts in favor of the nonmoving party. Bruce v. Cole, 854 So.2d 47 (Ala. 2003), and Pitney Bowes, Inc. v. Berney Office Solutions, 823 So.2d 659 (Ala. 2001). See Ex parte Helms, 873 So.2d 1139 (Ala. 2003), and Willis v. Parker, 814 So.2d 857 (Ala. 2001)."
Hollis v. City of Brighton, 885 So.2d 135, 140
(Ala. 2004).
 Facts
The facts of the case, viewed, as the standard of review requires, most favorably to Blackwood, the nonmoving party, are as follows:
Conner is a captain with the City's police department. On the day of the accident he had just completed issuing a speeding ticket to a motorist at 4:00 p.m. when he heard a radio dispatch advising that another police officer for the City, Jeff Rainwater, was en route to the scene of an automobile accident just outside the city limits involving personal injury. Conner testified in his deposition that Rainwater "had already gone by me at Code III," i.e., in emergency-response mode with full lights and siren. Conner remembers also that "somebody told me that it was a wreck and it was real bad." He elected to proceed to the accident scene to provide backup, proceeding with lights and siren fully activated. When he had traveled approximately one-half mile he was approaching the Johnson's Crossing intersection, which Conner acknowledged in his deposition was "more dangerous than any other intersection" in the area. A red Chevrolet Beretta automobile, the driver of which was subsequently determined to be intoxicated, pulled out from a service station located on the southeast corner of the intersection, to Conner's right. Attempting to avoid that vehicle, Conner lost control of his patrol car and traveled through the intersection into the opposing lanes of traffic, colliding head-on with the automobile occupied by Blackwood.
Critically important to our disposition of this appeal is the fact that the state trooper who investigated the accident involving Conner's patrol car stated in his accident-investigation report (submitted by Blackwood as a part of his opposition to the motion for a summary judgment and not objected to by the defendants) that he calculated Conner's minimum speed at the time of impact to have been between 91 and 101 miles per hour. The summary-judgment record also contains the trooper's affidavit stating, after reciting his qualifications and experience and the basis for his opinion: "[I]t is my opinion, within a reasonable degree of certainty, that at the time of impact Mr. Conner's vehicle was traveling at a minimum of between 91 *Page 500 
and 101 miles per hour." Conner, on the other hand, testified in his deposition that he estimated that his speed just before the collision was around 75 miles per hour and that "I just know I wasn't running ninety miles an hour." The parties agree that the speed limit for the stretch of road on which the accident involving Conner occurred was 55 miles per hour.
The police chief at the time of the accident was Elwin Grimmet, who had succeeded Chief Junior Flannagan. Among the official departmental "rules and regulations" Chief Flannagan had promulgated during his tenure was one that restricted a police vehicle traveling to an emergency from exceeding the posted speed limit by more than 15%. However, Conner testified, and Chief Grimmet filed an affidavit attesting, that when Chief Grimmet came into office (around 1999, according to Conner's recollection), he rescinded all rules and regulations previously enacted by Chief Flannagan, including the speed limitation on emergency runs. According to Grimmet's affidavit, the 15% limitation represented "an ineffective restriction on law enforcement and was never the policy of my department when I was chief." In the memorandum under cover of which Chief Flannagan issued his departmental rules and regulations, he stated "[o]nly the Chief of Police will authorize any variation" from the policies and that "[o]nly published changes will be recognized." Although Chief Grimmet had advised Conner that he would be issuing "new rules and regulations" to replace those he abrogated upon becoming chief of police, he never did.
In connection with his contention that there were no rules or regulations of the City of Hanceville Police Department in effect at the time of the accident, including the 15% limitation on excess speed, Conner stated in his deposition that "state guidelines" would have substituted to furnish the policy for making emergency calls and approaching an intersection on an emergency run and that the rules promulgated by the Department of Public Safety ("DPS") required that the speed of a vehicle responding to an emergency situation should be "reasonable and prudent."[1]
Although Conner contended in his deposition that it could be safe to operate his police vehicle at 90 miles an hour in responding as backup to an accident scene, "depending on the need," he acknowledged that he had never operated his vehicle between 90 and 100 miles per hour in responding to an accident when he knew another officer was already on the scene, and he admitted that a speed of 90 to 100 miles per hour in such a situation "would not be reasonable." Asked how he decided the speed at which to proceed when responding to an accident scene, Conner answered that every case was different, agreed that he would have to take into consideration the traffic conditions, and agreed further that he had the responsibility to operate his vehicle "in a safe manner" at all times, even in emergency situations. At another point in his deposition, when asked if approaching the potentially dangerous Johnson's Crossing intersection at a speed of between 90 and 100 miles per hour would have been "an unsafe thing to do," Conner answered "I would think, yes, sir." Conner stated that "anybody running code, Code III especially[,] needs to operate in a safe manner."
Explaining why he felt that Chief Flannagan's rule prohibiting responders to a Code III from exceeding the posted speed limit by more than 15% was not a good *Page 501 
rule, Conner testified, "I believe that the operator should operate his motor vehicle at a safe and prudent speed," and the 15% limitation would not "give [the operator of the vehicle] enough"; he testified that whatever the officer felt was reasonable and prudent would be appropriate, "[a]s long as he was safe and safe to the general motoring public. . . ." Conner was asked at this point if he had not already responded affirmatively to the question whether "at the time of this accident where you were located if you had been traveling between 90 and 100 miles per hour, that would have been unsafe"; and he had responded to that earlier question, "[y]es, sir. If I had been traveling 90 or 100 miles an hour." On the other hand, he testified, he "felt like" 75 miles per hour would be safe. Asked if there was "some type of state policy or DPS policy with regard to approaching an intersection when you are on an emergency run," Conner answered, "[y]es, ma'am, approach with caution." He agreed that approaching an intersection with caution was a basic precautionary procedure that emergency personnel will take and that he was "under those same policies on the day of this accident."
 Issues and Analysis
The summary-judgmemt order states, in pertinent part:
 "[T]he Court has determined that the allegations of the Complaint taken most favorably to [Blackwood] describe a set of circumstances that are controlled by the application of discretionary function immunity. Assuming1 facts most favorable to [Blackwood] it is undisputed that the defendant Conner, acting in the course and scope of his employment as an officer for the City of Hanceville Police Department, was responding to an emergency which eventually involved a fatality to a young woman. During the course of his effort to respond to the emergency, he drove in speeds in excess of the posted speed limit while operating sirens and emergency flashing lights. Another automobile driven by an intoxicated motorist pulled in front of Officer Conner and . . . in an effort to avoid that collision he lost control of his vehicle and struck the Blackwood vehicle.
 "The Court finds this circumstance to be covered by the provisions of the immunity from tort liability granted by § 6-5-338(a) Code of Alabama [1975]. The officer was the driver of an authorized emergency vehicle using audible signal and light as required and responding to an emergency call as a police officer. In making the response to the call, he was performing a discretionary function. While there are allegations that his speed was excessive for the circumstances and others expressing opinion that it was not excessive for the circumstances, these questions of fact do not override the compelling public policy for granting immunity to law enforcement officers who must make split second decisions when responding in emergency mode and not be subject to the calculus of hindsight or second-guess. The Court is persuaded by the logic as expressed in Drain v. Odom, 631 So.2d 971
(Ala. 1994), White v. Birchfield, 582 So.2d 1085 (Ala. 1991), and Williams v. Crook, 741 So.2d 1074 (Ala. 1999), which all essentially stand for the position that an officer deciding to respond to an emergency call and driving in emergency mode is performing a discretionary function and both the decision to respond to the call and manner in which he responded required the exercise of his own judgment and . . . to expose the officer to liability for exercising his judgment would be to add unto the officer the responsibility to ponder and ruminate over decisions that should be made in a split second. Therefore, however *Page 502 
unwise in hindsight the responding officer's actions may seem, I must hold his decision to respond to the call as ranking officer and to drive at what is alleged to have been an excessive speed was in the context of the situation within the scope of his discretionary functions. See White v. Birchfield, holding that as a matter of law the officer is immune from tort liability based on his decision to answer a call regarding an emergency in progress. The Court there recognized that even though the call was not directed specifically to the officer (a circumstance not dissimilar from this situation) and he was alleged to have driven an excessive speed nonetheless the situation was in the boundaries of discretionary function authority."
(Emphasis by the trial court.)
Blackwood asserts in his brief to this Court that Chief Flannagan's departmental rule requiring Code III responders not to exceed the posted speed limit by more than 15% had not been effectively repealed before the accident because Chief Grimmet had not adopted a new rule to replace it. In that regard, Blackwood relies solely on the statement in Chief Flannagan's memorandum issuing the departmental rules and regulations that only the chief of police could authorize any variation from the rules and that "only published changes" would be recognized. Blackwood offers no explanation, based on legal principle or otherwise, for how one police chief could bind all of his successors, in perpetuity, to a particular procedural policy. The record contains no suggestion that Chief Flannagan's rules and regulations had been adopted or approved by the City of Hanceville, and we are aware of no limitation under the law on the right of a successor police chief to rescind any rule or regulation put in place by the mere personal declaration of his or her predecessor, including a rule purporting to limit the mode of communicating changes in the rules. Conner and the City have established by substantial evidence that Chief Grimmet expressly rescinded all of Chief Flannagan's "rules and regulations" when he succeeded him, including specifically the 15% limitation-on-excess-speed rule. The mere fact that Chief Grimmet did not timely issue new rules and regulations does not serve to vitiate his unequivocal act of explicitly rescinding the rules and regulations promulgated by Chief Flannagan. Accordingly, Conner's discretion to exceed the speed limit on the occasion of the accident at issue here was not subject to the by then rescinded 15% excess-speed limitation imposed by Chief Flannagan.
Apart from arguing that Conner's personally estimated speed of 75 miles per hour would have violated Chief Flannagan's 15% excess-speed-limitation rule, Blackwood advances no real argument in either his principal appellate brief or his reply brief that such a speed would exempt Conner from the privilege accorded by § 32-5A-7 to exceed the maximum speed limit. We note that the only evidence contained in the record concerning the propriety of a speed of 75 miles per hour under the prevailing circumstances was the opinion testimony of Conner. When asked in his deposition if it was his position that operating his vehicle at 75 miles per hour would have been reasonable and prudent under the circumstances, he answered: "Considering that I was watching the highway the whole time and gauging my speed on the climate of the highway, yeah, because I felt like I had control of the vehicle." Thus, there is no basis in the record, at this stage of the proceedings, for concluding that a speed of 75 miles per hour at the time and place in question violated any of the conditions and limitations imposed by § 32-5A-7. Implicitly acknowledging that he does not contend *Page 503 
that a speed of 75 miles per hour would be outside the privilege accorded Conner by § 32-5A-7(b)(3) to exceed the maximum speed limit, Blackwood states in his reply brief that "[t]he issue that is before this Court is whether traveling at speeds in excess of 90 miles per hour (90 m.p.h.) in a back-up role is unreasonable and/or excessive under the circumstances." (Blackwood's reply brief, p. 10.) Reiterating, Blackwood states later in his reply brief:
 "However, the criticism of Conner is not his decision to proceed to the scene of the accident Code III and not his decision to travel at a speed in excess of the posted speed limit; the criticism of Conner, and where the liability rests, is with his decision to travel at an excessive rate of speed; a speed in excess of ninety miles per hour (90 m.p.h.) — where even he testified would be unreasonable."
(Blackwood's reply brief, p. 14.)
As noted, § 6-5-338(a) provides that peace officers like Conner "shall at all times be deemed to be officers ofthis state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function in the line and scope of his or her law enforcement duties." (Emphasis supplied.)
In a plurality decision in Ex parte Cranman,792 So.2d 392 (Ala. 2000), this Court "restate[d] the rule governing State-agent immunity," 792 So.2d at 405. The Court later adopted the "new test suggested in Cranman" in Ex parteButts, 775 So.2d 173, 177-78 (Ala. 2000). TheCranman test is as follows:
 "A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
 "(1) formulating plans, policies, or designs; or
 "(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
 "(a) making administrative adjudications;
 "(b) allocating resources;
 "(c) negotiating contracts;
 "(d) hiring, firing, transferring, assigning, or supervising personnel; or
 "(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
 "(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, lawenforcement officers' arresting or attempting to arrest persons; or
 "(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
 "Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
 "(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
 "(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, *Page 504 
beyond his or her authority, or under a mistaken interpretation of the law."
792 So.2d at 405.
"Cranman is a restatement of the law of immunity, not a statute. . . . Cranman states categories, but does not purport to set forth an exhaustive list of activities falling within each category." Howard v. Cityof Atmore, 887 So.2d 201, 206 (Ala. 2003).
Before Cranman, the immunity accorded a peace officer under § 6-5-338(a) was analyzed in terms of whether at the time of the act complained of the officer was engaged in the performance of a discretionary act.
 "Thus, this statute shields police officers from tort liability for discretionary acts performed "within the line and scope of [their] law enforcement duties.' [§ 6-5-338(a)]; Williams [v. Crook], 741 So.2d [1074] at 1076 [ (Ala. 1999) ]. `Alabama law has defined "discretionary acts" as "`[t]hose acts [as to which] there is no hard and fast rule as to course of conduct that one must or must not take' and those requiring `exercise in judgment and choice and [involving] what is just and proper under the circumstances.'"' Montgomery v. City of Montgomery, 732 So.2d 305, 310
(Ala.Civ.App. 1999) (emphasis added), `[lender the distinction between ministerial and discretionary functions, "the official is immune only where that which he does in the performance of his lawful duties requires `personal deliberation, decision and judgment.'"' White v. Birchfield, 582 So.2d 1085, 1087 (Ala. 1991)."
Norris v. City of Montgomery, 821 So.2d 149, 153
(Ala. 2001) (a post-Cranman case, but argued and decided without reference to Cranman). See also Ex parteCity of Montgomery, 758 So.2d 565 (Ala. 1999); Williamsv. Crook, 741 So.2d 1074 (Ala. 1999); and Couch v. Cityof Sheffield, 708 So.2d 144 (Ala. 1998).
However, "[w]hether a qualified peace officer is due §6-5-338(a) immunity is now judged by the restatement of State-agent immunity articulated by Ex parte Cranman,792 So.2d 392 (Ala. 2000). . . ." Hollis,885 So.2d at 143.
 "By enacting [§ 6-5-338], the Legislature intended to afford municipal law-enforcement officials the immunity enjoyed by their state counterparts. Sheth v. Webster, 145 F.3d 1231, 1237 (11th Cir.1998). Indeed, `[t]his statute, by its terms, extends state-agent immunity to peace officers performing discretionary functions within the line and scope of their lawenforcement duties.' Moore v. Crocker, 852 So.2d 89, 90
(Ala. 2002) (emphasis added).
 "In Ex parte Cranman, supra, this Court `restated the law of state-agent immunity in Alabama.' Moore, 852 So.2d at 90. Since Cranman, we analyze immunity issues in terms of `State-agent' immunity, rather than `under the dichotomy of ministerial versus discretionary functions.' Ex parte Hudson, 866 So.2d 1115, 1117 (Ala. 2003). See also Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala. 2003); Ex parte Turner, 840 So.2d 132, 134 n. 1 (Ala. 2002). Thus, we will address the applicability of peaceofficer immunity under the principles set forth in Cranman. See Moore, supra; Ex parte Duvall, 782 So.2d 244 (Ala. 2000)."
Howard, 887 So.2d at 203.
The parties acknowledged at oral argument, and we agree based upon our independent assessment, that the facts of this case do not fall within any of the Cranman categories of State-agent immunized activity. The category coming the closest to having applicability would be *Page 505 
category (4), extending immunity when the conduct made the basis of the claim against the State agent is based on the agent's "exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to law-enforcement officers' arresting or attempting to arrest persons." The circumstances of Conner's emergency run did not implicate the enforcement of the criminal laws of this State, however. Because Conner's conduct does not fit within any category of conduct recognized by the restated rule ofCranman as immune, he is not entitled to State-agent immunity within the illustrations set forth in Cranman.Cranman, 792 So.2d at 406; Ex parte Rizk,791 So.2d 911 (Ala. 2000); and Wimpee v. Stella,791 So.2d 915 (Ala. 2000).[2]
In Hollis, we made the following observations concerning the possibility that immunity under § 6-5-338(a) and under category (4) of Cranman might not completely overlap:
 "We notice a difference between certain critical language in the statute, § 6-5-338(a), and certain critical language in the Cranman restatement describing the conduct immunized. That is, the statute refers to `conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties' while immune category (4) of the Cranman restatement refers to conduct `exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons.' In the particular case now before us, we need not decide whether or how the difference between the language of the statute and the language of the Cranman restatement affects the scope of the immunity, since the record does not establish without dispute or as a matter of law that the act of the policeman . . . fits within either
description of immune conduct. Nor does the record establish without dispute or as a matter of law that the act of the policeman fits within any of the other Cranman categories of immune conduct. Thus, we cannot rely on the § 6-5-338(a) immunity, as described by either the statute itself or the Cranman restatement, to affirm the summary judgment on the plaintiffs' claim for vicarious liability for the act of the policeman."
885 So.2d at 143-44.
We need not decide whether or how the difference between the language of § 6-5-338(a) and the language of theCranman restatement might need to be further reconciled, because the conduct for which Conner is seeking immunity is the driving of an authorized emergency vehicle in response to an emergency call. In such a case, the immunity afforded the peace officer under either description of immune *Page 506 
conduct is subject to, and limited by, the conditions imposed by § 32-5A-7. In the particular settings described by §32-5A-7(a), the legislature has acted to restrain the manner in which the driver of the emergency vehicle may exercise his or her discretion and judgment.
In Williams, supra, a municipal police officer responding to a domestic-disturbance call on a rainy night elected to exceed the speed limit but not to turn on his patrol car's flashing blue lights and siren. 741 So.2d at 1075. A vehicular collision occurred, and the officer and the municipality by whom he was employed were sued. The trial court entered a summary judgment for the officer and the municipality, under § 6-5-338, based on the officer's explanation that he had exercised his discretion in deciding not to use his emergency signals "because he was concerned that using them might alert anyone at the site of the domestic disturbance to the imminent arrival of the police and that anyone seeking to evade the police might thus have an opportunity to flee." 741 So.2d at 1075. This Court reversed the summary judgment, agreeing that § 32-5A-7 gave the officer discretion to drive at a speed in excess of the speed limit but determining that, under the language of that statute, the officer did not have the discretion to exceed the speed limit without using his emergency signals. Section 32-5A-7(c) expressly states that the various exemptions granted an authorized emergency vehicle by that Code section would apply only when the vehicle is using acceptable audible and visual signals. "Although [the officer] did have the discretion to decide whether he would drive in excess of the speed limit, once he made that decision he did not have the discretion to further decide whether he would comply with the audible and visual signal requirements of § 32-5A-7(c)."741 So.2d at 1077.
As noted, § 32-5A-7 not only authorizes the driver of an emergency vehicle to exercise the various privileges set forth in the statute, including exceeding the maximum speed limit when using acceptable audible and visual signals, it also provides specifically that the driver of the emergency vehicle exceeding the maximum speed limit may do so "so long as he does not endanger life or property." Section 32-5A-7(b)(3). Subsection (a) states that exercise of any of the privileges set forth in the statute is "subject to the conditions herein stated." Subsection (d) concludes the statement of privileges with the declaration that they "shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard to the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others." Obviously, the conditions imposed by subsections (b)(3) and (d) differ in degree from the audible and visual signals condition of subsection (c), in that the latter is an objectively "absolute" restriction whereas the others are subjectively "relative" restrictions. Nonetheless, the legislature saw fit to impose the restrictions in subsections (b)(3) and (d), and it is our obligation to determine the scope of those subsections and apply them to the facts of this case. We reject the argument made by Conner and the City in their brief to this Court that the actual speed at which Conner was traveling is "irrelevant," although we agree that it is within a police officer's discretion to drive at a speed in excess of the speed limit when driving an authorized emergency vehicle on an emergency run because the legislature has clearly provided that the officer may do so. Williams, 741 So.2d at 1077. The legislature has simultaneously declared, however, that an officer may do so only "so long as he does not endanger life or property" and has further conditioned the exercise of that *Page 507 
privilege by recognizing the officer's continuing "duty to drive with due regard for the safety of all of the persons," removing the protection of the privilege if the officer drives with "reckless disregard for the safety of others."
Obviously, the legislature did not intend § 32-5A-7(b)(3) simply to have a retrospective application, so that an emergency vehicle driver forfeits the privilege accorded by the statute any time he or she exceeds the speed limit and a wreck occurs that endangers life or property. Rather, it is clear that the legislature intended that this standard, along with the others specified in the statute, be applied from the perspective of a reasonably prudent emergency driver exercising his or her discretion under the prevailing circumstances. We need not attempt to refine the standards further for purposes of this case, because, under the unique evidentiary record presented, Conner's own testimony establishes that traveling between 90 and 100 miles per hour in responding as backup to the scene of an accident, when another officer is already on the scene, would "not be reasonable," and that to approach an intersection known to be dangerous at that speed would be "an unsafe thing to do." Conner conceded that a speed of between 90 and 100 miles per hour in the locale in question would have been "unsafe."
These admissions by Conner are sufficient to create a genuine issue of material fact as to whether, assuming (as we must under the standard of review that controls our identification of the facts in this case) Conner was traveling at a minimum speed of 91 miles; per hour while approaching the dangerous Johnson's Crossing intersection, he would be charged with notice that he was driving in a manner that endangered life or property and represented a reckless disregard for the safety of others. It will be for the jury to decide Conner's actual rate of speed on the occasion in question and, under appropriate instructions from the trial court, to decide whether, acting within his discretion to exercise his best judgment, Conner should have known that the speed at which he was driving, under all the attendant circumstances, endangered life or property and constituted a reckless disregard for the safety of others, or whether he was acting with due regard for the safety of others. If the speed as determined by the jury is found by it to have been such as would necessarily endanger life or property and be a violation of Conner's duty to drive with due regard for the safety of others, Conner will not be entitled to the protection of the immunity and privilege resulting from the interaction of § 6-5-338(a) and § 32-5A-7(b)(3). If the jury determines that Conner, traveling at the speed it determines he was traveling, was acting with due regard for the safety of others, he will be entitled to the protection of that immunity and privilege.
Given the genuine issues of material fact that exist in that regard, Conner is not presently entitled to judgment as a matter of law. Moreover, because the City's immunity is linked to Conner's, see § 6-5-338(b) and Howard,887 So.2d at 211, the summary judgment entered for City is likewise unsustainable.
Our holding in this case does not in any way represent a retreat from our recognition that police officers have to be accorded a high degree of discretion in the performance of their duties because, as the Alabama Court of Civil Appeals has observed in reviewing our cases on point:
 "[O]ur supreme court has stated that discretionary-function immunity must exist because a police officer should not be required `to ponder and ruminate over decisions that should be made in a *Page 508 
split second.' White v. Birchfield, 582 So.2d 1085, 1087 (Ala. 1991). Our supreme court has also stated that the grant of discretionary-function immunity is justified by "`[t]he need to attract and keep capable [police] officers, the allocation of scarce resources for law enforcement, and the need for officers to make decisions based on the requirements of the circumstances rather than on their potential for personal liability."' Nunnelee v. City of Decatur, 643 So.2d 543, 546 (Ala. 1993) (quoting Thetford v. City of Clanton, 605 So.2d 835, 843 (Ala. 1992)). In addition, it has been held that the shield of discretionary-function immunity is `"particularly applicable"' where `"[a police] officer is required to make difficult decisions on the spur of the moment"' while performing his law-enforcement duties, Nunnelee, 643 So.2d at 546 (quoting Thetford, 605 So.2d at 843), and in situations where a police officer responds to a `life-threatening situation,' Birchfield, 582 So.2d at 1087. More recently, it has been held that discretionary-function immunity applies when a police officer is required to make `difficult split-second decision[s] under unusual circumstances.' Ex parte City of Gadsden, 781 So.2d at 940."
Thurmond v. City of Huntsville, 904 So.2d 314, 320
(Ala.Civ.App. 2004).
Rather, our holding is based on the particular facts of this case, at least in the light in which they must be viewed under the applicable standard of review for a summary judgment, and on our recognition that to hold that a peaceofficer driver of an emergency vehicle on an emergency call would have the discretion to drive at whatever speed he or she might chose, without limitation, would render meaningless the several "conditions" imposed by the legislature in § 32-5A-7. We also note that we are not called upon to consider whether any additional or separate principles might apply if the peace officer driving a patrol car is not simply "responding to an emergency call," but rather, in accord with another of the scenarios stated by § 32-5A-7(a), is "in the pursuit of an actual or suspected violator of the law."
The summary judgment entered in favor of Conner and the City is reversed, and this cause remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
NABERS, C.J., and SEE, LYONS, WOODALL, SMITH, BOLIN, and PARKER, JJ., concur.
[1] The DPS rules, although referenced and paraphrased at several points during Conner's deposition, are not included in the record on appeal.
[2] We note that Justice Lyons, the author ofCranman, stated in his special writing inHollis, supra:
 "The day may well come when the restatement in Ex parte Cranman, 792 So.2d 392 (Ala. 2000), should be modified so as to extend the reference in paragraph (4) dealing with `exercising of judgment in the enforcement of criminal laws,' 792 So.2d at 405 (emphasis added), to include an additional phrase dealing with `discharge of law-enforcement duties.' However, I agree with the main opinion that that issue at this stage of the proceedings in the instant case is not yet ripe for determination."
885 So.2d at 145. Neither party asks us to undertake in this case such an extension of category (4) of the Cranman
test, and, given our ensuing analysis and disposition of the immunity issue presented, a modification of Cranman
category (4) along the lines discussed by Justice Lyons inHollis would have no effect on the outcome of this case. Therefore, we need not consider whether such a modification is in order.