BOLIN, Justice.
The Alabama Department of Corrections (“the DOC”);[1] Cheryl Price, former *1173 warden of Bibb Correctional Facility (“the facility”); Dwayne Estes, former assistant warden of the facility; and Captain John Hutton, a correctional officer at the facility (the individual defendants are hereinafter collectively referred to as “the prison defendants”), petition this Court for a writ of mandamus directing the Montgomery Circuit Court to vacate its order denying their motion for a summary judgment and to enter a new order granting the motion on the ground that they are entitled to immunity. We grant the petition and issue the writ.

I. Facts and Procedural History

On May 25, 2010, Tyus Elliott, an inmate at the facility, died from a stab wound inflicted by Dexter Fields—another inmate at the facility.[2] The stabbing incident occurred in the “D” dormitory, an open-bed bay area within the facility that houses approximately 106 inmates. The facts concerning the incident relied on by the parties come primarily from the deposition testimony of Fields, Cpt. Hutton, and Price. Fields testified that on May 25, 2010, at approximately 3:30 a.m., he was in a classroom in the back of the “D” dormitory where he was downloading some videos onto a contraband cellular telephone (“cell phone”);[3] Fields 'actually possessed three or four contraband cell phones. While Fields was downloading the videos onto the cell phone, Elliott- entered the room and began talking to Fields, asking him for a cigarette and/or a cigarette lighter. While Elliott distracted Fields, another inmate, Kevin Maull, entered the room and took Fields’s cell phone from a window ledge where Fields had laid it. Fields moved toward Maull in an attempt to retrieve the cell phone. However, Fields retreated when Maull “brandished” a knife. Maull backed out of the classroom, accompanied by three or four 'inmates: Fields testified that he did not suspect that Elliott had played a role in Maull’s taking the cell phone. At approximately 6:00 a.m., Fields was summoned to the shift office where he was questioned by a correctional officer, Officer Bryan, regarding “the phone situation and everything.” Fields denied having had a cell phone. Officer Bryan allowed Fields to return to the “D” dormitory, after which numerous correctional officers searched the dormitory—turning up several contraband items. After the search, Fields was summoned to meet with Cpt. Hutton. During Fields’s meeting with Cpt. Hutton, Maull was escorted into the room. Cpt. Hutton told Fields that “this [is] the guy right here that upped the knife on you and took the phone.” Cpt. Hutton gave Fields and Maull a “living agreement” to sign, which indicated that the two could live peacefully together in the same, dormitory without fighting. According to Fields, Maull did not go back to the “D” dormitory right then; Fields did not know exactly where Maull went or where he had been taken. Fields remained with Cpt. Hutton for ap *1174 proximately six or seven hours. During that time, a discussion ensued between Cpt. Hutton and Ms. McCall, the person responsible for bed assignments at the facility. McCall told Cpt. Hutton that she had made arrangements for Fields to be moved to another dormitory within the facility; McCall thought it would be best for Fields’s own protection. However, Cpt. Hutton told Fields he could return to the “D” dormitory. When McCall asked Cpt. Hutton why he was going to send Fields back to the “D” dormitory, Cpt. Hutton replied that he “didn’t give a damn if they killed each other.” Fields did not know to whom Cpt. Hutton was referring. Elliott’s name was never brought up during the meeting between Cpt. Hutton, Fields, and Maull, and it never registered with Fields, during the meeting, that Elliott had been involved in the scheme to take his cell phone. On the way back to the “D” dormitory, Fields retrieved an “inmate-made” knife he had hidden in the yard of the facility. Fields retrieved the knife for his own protection because of the incident that had occurred earlier in the day between him and Maull. When Fields returned to the “D” dormitory, he discovered that his other cell phones were missing; he was informed by another inmate that Elliott had taken them. Fields saw Elliott standing against the wall “brandishing” a knife and acting “strange.” Fields approached Elliott to confront him, at which time Elliott hit Fields in the mouth, prompting Fields to spontaneously stab Elliott in the chest ax-ea. Fields did not put “two and two together”—that Elliott had been involved in the first cell-phone incident—until he returned to the “D” dormitory and learned that Elliott had taken the other cell phones. Fields specifically testified in response to questioning by counsel for the prison defendants:
“A. Get back [to the dormitory], some of the stuff they packed up was scattered out, and the other phones I had were stolen, you know. Tyus Elliott went and got the remains after he found that I wasn’t going to do anything, you know. Rumor got out that I wasn’t going to do anything to Maull. That’s when he took his mask off and showed his face. He went ahead on and took the remains of the phones and stuff like that.
[[Image here]]
“Q, And [Elliott] stole those while you were up at—with Captain Hutton?
“A. Yes.
“Q. And how did you know that?
“A. Other inmates told me.
“Q. So if—it’s about four o’clock still. What did you do when you found that out?
“A. I confronted him.
“Q. Okay. That’s—and is 'that when ... you had a knife?
“A. Well, yes, I had got one then.
[[Image here]]
“Q. So, anyway, you went to get— did you go to kill [Elliott] or just go get your stuff back?
“A. I ain’t go to kill him, no. Wasn’t even going to be none of that. The knife was on me just for protection because everybody kept on pulling them out on me, and I wasn’t going to be pulled on anymore. That’s the only reason why I had the knife. I had the knife before I even discovered that my other phones were missing. I picked the knife up from another place I had it hidden on the way back to the [dormitory].

H

“Q. Okay, so you went by the yard on the way back, got your knife for protection?
[[Image here]]
*1175 “A. I did not know that [Elliott] had stolen my phone before I had got the knife. I had got the knife so that I could protect myself due to being attacked earlier.
a
“Q. And it was obvious to you that you checked your stuff and, [your] phone[s] [are] gone, right?
“A. Well, yes. Because he’s standing on the wall and now he’s got a knife and he’s brandishing. He ain’t even acting his self.
«
“Q, AH right. And so what’s the first words or actions taken in this—in this confrontation?
“A. Well, I asked him—we exchanged some words. He said, say what you got to say. I asked him about my phone, and he tells me to get out of his face, you know what I’m saying. I don’t move. And he swings, you know what I’m saying. I stab. End of story.
[[Image here]]
“Q. And did.you feel like you needed to stab him to protect yourself?
“A. It was spontaneous. .
[[Image here]]
“Q. Okay. So this thing between you and Elliott really just happened when you got back from Captain Hutton’s office. Is that what you’re saying? Not building up, it happened.
“A. At the time I wasn’t [aware].
“Q. I got you. So you didn’t even know you had a problem with Tyus Elliott .., until you got back in the dorm after talking with Captain Hutton [and put two and two together]?
[[Image here]]
“A. Yes, at that moment.”
Cpt. Hutton testified in his deposition that when he arrived at the facility on the morning of May 25, 2010, he was informed by a correctional officer that there had been an incident on the night shift involving a cell phone that had been taken from Fields. Cpt. Hutton summoned Fields for questioning, but Fields was reluctant to talk and offered no information regarding the incident. Cpt. Hutton was subsequently informed by the same correctional officer that a superintendent had identified Maull as the person who had taken Fields’s cell phone. Accordingly, Cpt. Hutton had Maull summoned for questioning as well. Cpt. Hutton asked Fields if Maull was the inmate who had taken his cell phone, to which Fields replied “yes.” Maull, on the other hand, denied that anything had happened. After Cpt. Hutton completed his investigation, Maull was detained in inmate-control services and then later confined to administrative segregation; Cpt. Hutton confined Maull for the purpose of separating'him from Fields and because Maull had stolen something from Fields. Cpt. Hutton also wanted to make sure there was a cooling-down period and no payback against Maull by Fields. However, Cpt. Hutton did not consider Maull and Fields to be “enemies” per se because they had signed a “living agreement,” stating they had'no problem living in the same dormitory. Cpt. Hutton then asked Fields if he felt threatened going back into the general prison population, to which Fields replied “no.” The superintendent who relayed the information to the correctional officer concerning the cellphone incident never reported that a knife was involved in the conflict between Fields and Maull; Cpt. Hutton did not inquire of Fields or Maull if a knife had been involved.
'On May 24, 2012, Veronica McCaskill, as administratrix of Elliott’s estate, sued the DOC and the prison defendants asserting various claims of negligence and wantonness; the gravamen of the complaint is *1176 that the DOC and the prison defendants failed to confíne Fields, the victim of the cell-phone incident, to administrative segregation so as to prevent Elliott’s death.[4] McCaskill also included in her complaint a claim for equitable relief in the form an order compelling the DOC and the prison defendants “to perform legal duties and ministerial acts.”
On September 20, 2013, the DOC and the prison defendants moved for a summary judgment. On April 23, 2015, McCaskill filed an amended complaint to add a claim asserting violation of 42 U.S.C. § 1983, alleging that the DOC and the prison defendants’ failure to protect Elliott from the fatal attack by Fields constituted a violation of his rights under the Eighth Amendment to the United States Constitution.[5] On August 20, 2015, the circuit court denied the DOC and the prison defendants’ motion for a summary judgment. On October 1, 2015, the petitioners filed their petition for a writ of mandamus, contending that the DOC is entitled to dismissal of McCasMll’s claims against it on the ground of sovereign immunity; that Price, Estes, and Cpt. Hutton are entitled to the dismissal of the claims against them on the ground of State-agent immunity; and that Price, Estes, and Cpt. Hutton are entitled to dismissal of the § 1983 claim against them on the ground of qualified immunity.

II. Standard of Review

“The writ of mandamus is a drastic and extraordinary writ, to be issued only when there is a clear legal right to the relief sought, a duty upon the respondent to perform, a refusal to do so, lack of another adequate remedy, and properly invoked jurisdiction of the court.”
Ex parte Gonzalez, 686 So.2d 204, 205 (Ala.1996).
“While the general rule is that the denial of a motion for summary judgment is not reviewable, the exception is that the denial of a motion for summary judgment grounded on a claim of immunity is reviewable by petition for writ of mandamus.”
Ex parte Rizk, 791 So.2d 911, 912 (Ala.2000).

III. Analysis

A. Sovereign Immunity—The DOC

The DOC and the prison defendants assert that the DOC is entitled to sovereign immunity pursuant to Article I, § 14, Alabama Constitution of 1901, which provides that “the State of Alabama shall never be made a defendant in any court of law or equity.” In Alabama Department of Transportation v. Harbert International, Inc., 990 So.2d 831, 839-40 (Ala.2008) (abrogated in part on other grounds by Ex parte Moulton, 116 So.3d 1119, 1141 (Ala.2013)), this Court stated the following well established law regarding sovereign or State immunity:
*1177 “Section 14 provides generally that the State of Alabama is immune from suit: ‘[T]he State of Alabama shall never be made a defendant in any court of law or equity.’ This constitutional provision ‘has been described as a “nearly impregnable” and “almost invincible” “wall” that provides the State an unwaivable, absolute immunity from suit in any court.’ Ex parte Town of Lowndesboro, 950 So.2d 1203, 1206 (Ala.2006). Section 14 ‘specifically prohibits the State from being made a party defendant in any suit at law or in equity.’ Hutchinson v. Board of Trs. of Univ. of Alabama, 288 Ala. 20, 23, 256 So.2d 281, 283 (1971). Additionally, under § 14, State agencies are ‘absolutely immune from suit.’ Lyons v. River Road Constr., Inc., 858 So.2d 257, 261 (Ala.2003).
“Not only is the State immune from suit under § 14, but ‘[t]he State cannot be sued indirectly by suing an officer in his or her official capacity....’ Lyons, 858 So.2d at 261. ‘Section 14 prohibits actions against state officers in their official capacities when those actions are, in effect, actions against the State.’ Haley v. Barbour County, 885 So.2d 783, 788 (Ala.2004). To determine whether an action against a State officer is, in fact, one against the State, this Court considers
“ ‘whether “a result favorable to the plaintiff would directly affect a contract or property right of the State,” Mitchell [v. Davis, 598 So.2d 801, 806 (Ala.1992)], whether the defendant is simply a “conduit” through which the plaintiff seeks recovery of damages from the State, Barnes v. Dale, 530 So.2d 770, 784 (Ala.1988), and whether “a judgment against the officer would directly affect the financial status of the State treasury,” Lyons [v. River Road Constr., Inc.], 858 So.2d [257] at 261 [(Ala.2003)].’
“Haley, 885 So.2d at 788. Additionally, ‘[i]n determining whether an action against a state officer is barred by § 14, the Court considers the nature of the suit or the relief demanded, not the character of the office of the person against whom the suit is brought.’ Ex parte Carter, 395 So.2d 65, 67-68 (Ala.1980).”
It is undisputed that the DOC is a State agency and, therefore, is immune from suit pursuant to § 14. As to the DOC, the petition for a writ of mandamus is granted.

B. State-agent Immunity

McCaskill asserts that the prison defendants acted “willfully, maliciously, and in bad faith” by failing to adequately investigate the first cell-phone incident involving Fields and Maull and by failing to confine Fields to administrative segregation so as to prevent harm to Elliott. The prison defendants assert that they are entitled to State-agent immunity-on those claims because, they say, Cpt. Hutton was exercising his discretionary authority in investigating the first cellphone incident involving Fields and Maull and in determining thereafter that Fields was not a threat to return to the general prison population. • The prison defendants further assert that they had no knowledge of any conflict between Fields and Elliott or that Fields posed a threat to Elliott. Rather, they claim that Cpt. Hutton was aware only of the conflict between Fields and Maull involving the theft of the first cell phone.
In Ex parte Cranman, 792 So.2d 392, 405 (Ala.2000),[6] this Court set *1178 forth the following test for determining when State employees sued in their individual- capacities are entitled to State-agent immunity:
“A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent’s
“(1) formulating plans, policies, or designs; or
“(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
“(a) making administrative adjudications;
“(b) allocating resources;
“(c) negotiating contracts;
“(d) hiring, firing, transferring, assigning, or supervising personnel; or
“(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
“(4) exercising judgment in- the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers’ arresting or attempting to arrest persons; or
“(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
“Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
“(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
“(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.” Additionally,
“We have established a ‘burden-shifting’ process when a party raises the defense of State-agent immunity. Ex parte Wood, 852 So.2d 705 (Ala.2002). In order to claim State-agent immunity, [the prison defendants] bear the burden of demonstrating that [McCaskill’s] claims arise from a function that would entitle them to immunity. Wood, 852 So.2d at 709; Ryan v. Hayes, 831 So.2d 21 (Ala.2002). If the [prison defendants] make such a showing, the burden then shifts to [McCaskill], who, in order to deny the [prison defendants] immunity from suit, must establish that the [prison defendants] acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority. Wood, 852 So.2d at 709; Ex parte Davis, 721 So.2d 685, 689 (Ala.1998).”
Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala.2003).
In this case, McCaskill does not dispute that Cpt. Hutton was exercising his discretionary authority in conducting the investigation of the first cell-phone incident and in determining whether either Fields or Maull or both should be confined to admin *1179 istrative segregation. Rather, she claims only that Cpt. Hutton acted “willfully, maliciously, and in bad faith” by failing to confíne Fields to administrative segregation. Standard Operating - Procedure (“S.O.P.”) 005-19 for the facility defines administrative segregation as the “[n]on-punitive confinement of an inmate in a cell whose continued presence in the general population poses a serious threat of life, property, security, or the orderly operation of the institution.” S.O.P. 005-19 states, in pertinent part:
“A. Inmates will be placed in the segregation cells on the orders of the Warden, Deputy Warden, Captain, or Shift Supervisor. This action may become necessary to protect the inmate, preserve the tranquility of the general population or implement the sanction determined by a Due Process Hearing (Major Disciplinary). Generally, the reasons that an inmate is placed in this unit are as follows:
“1. At the inmate’s own request (and when the information is confirmed) because he fears imminent physical danger to his life in open population.
“2. ■ The inmate is considered potentially violent and dangerous to others if permitted to remain in open population.
“3. The inmate is considered an escape risk.
“4. The inmate has been sentenced to Disciplinary Segregation after being found guilty and approved by the Warden or Warden’s designee.
“5. The inmate is being held pending the outcome of an investigation.
“6. The inmate’s custody level increased; from Medium to Close or Level 5.”
(Emphasis added.)
S.O.P. 005-19 is discretionary in nature in that it allows the warden, deputy warden, captain, or shift supervisor to exercise his or her judgment in determining whether an inmate should be confined to administrative segregation. See, e.g., Carpenter v. Tillman, 948 So.2d 536, 539 (Ala.2006) (“The language of § 14—6—81[, Ala. Code 1975,]-vests the DOC with extremely broad discretion as to whether and when to conduct the inspections of county jails mandated by that Code section. Nothing in the certified question suggests that the decision not to inspect the jail between June 10, 1997, and July 28, 2000, was anything other than an exercise of that discretion.”). In this case, although S.O.P. 005-19 is discretionary insofar as it states that it may become necessary to segregate an inmate from the general population, it is undisputed that the DOC has .no written policy or procedure on how to conduct an investigation to determine if segregation is necessary, e.g., the questions that are to be asked during such an investigation and the people who are to be interviewed during the investigation. Rather, the circumstances of the incident dictate whether an inmate should be confined to administrative segregation. According to Cpt. Hutton, he decided to segregate Maull because Maull was the aggressor and needed to be disciplined. In other words, Cpt. Hutton was exercising his judgment in concluding from his investigation of the incident, that Fields would not be “potentially violent and dangerous to, others if permitted to remain in open population.” See, e.g., Ex parte Ruffin, 160 So.3d 750, 754-55 (Ala.2014)(“There appears to be no dispute that the petitioners are State agents who, at the time of [the attack], were performing a function—managing the confinement of and/or guarding prisoners with mental illness—that entitled them to State agent immunity. See Howard v. City of Atmore, 887 So.2d 201, 206 (Ala.2003) (‘Categories (3) and (4) of [the Cranman] restatement *1180 are clearly broad enough to contemplate the confinement of prisoners, which is the conduct in controversy here.’)-”)- Accordingly, the burden shifted to McCaskill in this case to demonstrate that Cpt. Hutton acted willfully, maliciously, or in bad faith by failing to confíne Fields, the victim of the cell-phone theft, to administrative segregation.
McCaskill contends that Cpt. Hutton’s decision not to segregate Fields, albeit discretionary, was exercised in bad faith and with malicious intent' because, she says, Cpt. Hutton should have conducted a more thorough investigation to determine whether Elliott could have been a potential target of retaliation by Fields. Specifically, McCaskill contends that Cpt. Hutton should have asked the correctional officer and/or superintendent who' reported the cell-phone incident if any other inmates were involved and that Cpt. Hutton should have asked Fields and Maull if a weapon was brandished or used during the incident.
As previously indicated, the facility has no specific policy or procedure for how its employees are to conduct investigations concerning prisoner conflicts. Both Cpt. Hutton, as well as Price, testified that the decision to confine an inmate to administrative segregation is based on the specific facts of each case, as well as on the severity of each case. In this casé, the correctional officer who reported the incident to Cpt. Hutton did not convey to him that any inmates other than Fields and Maull had been involved in the cell-phone incident; the correctional officer furthermore did not rfeport to Cpt. Hutton that a knife had been involved in the incident; Cpt. Hutton questioned both Maull and Fields concerning the first cell-phone incident; Maull denied that the cell-phone incident had occurred; Fields was reluctant to talk; and, based on these facts, Cpt. Hutton made the ultimate decision to confine Maull, the aggressor, to administrative segregation and to allow Fields, the victim of the cell-phone theft, to return to the general prison population. Elliott’s name was never brought up during Cpt. Hutton’s questioning of Fields and Maull. In fact, Fields testified that Fields never put “two and two together” that Elliott had played a role in Maull’s taking his cell phone until he returned to the “D” dormitory and learned from another inmate that Elliott had taken his other cell phones. Clearly, the evidence demonstrates that the prison defendants had no reason to foresee that Fields posed a threat to Elliott. Rather, the attack by Fields on Elliott, as Fields put it, was spontaneous insofar as the attack occurred immediately after Fields returned to the “D” dormitory and learned that Elliott had stolen his remaining cell phones.
McCaskill suggests that Cpt. Hutton should have placed Fields in administrative segregation as well as Maull. However, Cpt. Hutton explained the different case scenarios in which two inmates might both be confined to administrative segregation. By way of example, Cpt. Hutton testified that two inmates involved in a conflict might both be confined to administrative segregation if the inmates were fighting with weapons and they ended up “cutting each other.” As previously indicated, Cpt. Hutton testified that he had no knowledge that Maull had threatened Fields with a knife during the first cellphone incident. Accordingly, McCaskill’s suggestion that Cpt. Hutton should have been more thorough in his investigation to determine whether a weapon had been involved and/or whether an inmate other than Maull had been involved is irrelevant insofar as there was no written procedure concerning how to conduct an investigation of inmate conflicts; Cpt. Hutton was exercising his discretionary authority when he *1181 determined that Fields did not pose a threat to the general prison population.
McCaskill also relies heavily on Cpt. Hutton’s statement that he “did not give a damn if they kill each other” as being substantial evidence that Cpt. Hutton did not appreciate the threat of harm in sending Fields back to the “D” dormitory. Assuming Cpt. Hutton did make this statement, which he denies, the statement still does not indicate any intent, purpose, or design by Cpt. Hutton to inflict injury or harm on Elliott—especially where the evidence demonstrates that Cpt. Hutton had no knowledge that Fields posed a threat to Elliott and that Cpt. Hutton did not deem Fields, the victim of a theft, to be a threat to anyone in the general prison population. Accordingly, McCaskill has failed to establish the applicability of one of the Gran-man exceptions, and Cpt. Hutton, Price, and Estes are entitled to State-agent immunity on McCaskfll’s claim that they acted “willfully, maliciously, and in bad faith” in failing to conduct a more thorough investigation of the first cell-phone incident and in failing to confine Fields to administrative segregation.

C. Qualified Immunity

The prison defendants assert that they are entitled to qualified immunity on McCaskill’s civil-rights claim asserted pursuant to' 42 U.S.C. § 1983, in which she alleges that the prison defendants violated Elliott’s rights by failing “to protect Elliott from violence at the hands of Dexter Fields,” by failing “to isolate [Fields],” and by permitting “a culture of violence and terror” to reign in [the facility due to the proliferation of contraband cell phones],” “thereby resulting in ‘deliberate indifference’ to [Elliott’s] safety.” “The doctrine of qualified immunity generally shields government officials who are performing discretionary functions from liability for civil damages unless their conduct violates ‘clearly established statutory or constitutional rights.’ ” Ex parte Ruffin, 160 So.3d at 755 (quoting Ex parte Madison Cty. Bd. of Educ., 1 So.3d 980, 990 (Ala.2008)).
In Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir.2014), the United States Court of Appeals for the Eleventh Circuit stated the following legal principles regarding an Eighth Amendment violation:
“The Eighth Amendment ‘imposes [a] dut[y] on [prison] officials’ to ‘take reasonable measures to guarantee the safety of the inmates.’ Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (quotation marks omitted). In particular, under the Eighth Amendment, ‘prison officials have a duty to protect prisoners from violence at the hands of other prisoners.’ Id. at 833, 114 S.Ct. at 1976 (citing various courts of appeals) (quotation marks omitted and alterations adopted); Rodriguez [v. Secretary For The Dep’t Of Corr.J, 508 F.3d [611] at 616-17 [(11th Cir.2007)]. ‘It is not, however, every injury suffered by one inmate at the hands of another that translates into a constitutional liability for prison officials responsible for the victim’s safety.’ Farmer, 511 U.S. at 834, 114 S.Ct. at 1977.
“A prison official violates the Eighth Amendment ‘when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk.’ Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir.2003) (internal quotation marks omitted) (alterations adopted) (emphasis added); see also Farmer, 511 U.S. at 828, 114 S.Ct. at 1974 (‘A prison official’s “deliberate indifference” to a substantial risk of serious harm to an inmate violates the Eighth Amendment.’). To survive summary judgment *1182 on a deliberate indifference failure-to-protect claim, ‘a plaintiff must- produce sufficient evidence of (1) a substantial risk of serious .harm; (2) the defendants’ deliberate indifference to that risk; and (3) causation.’ Goodman v. Kimbrough, 718 F.3d 1325, 1331 (11th Cir.2013) (internal quotation marks omitted).”.
In Ex parte Ruffin, this Court cited the two-part test applicable in determining whether a public official is entitled to qualified immunity in a § 1983 action:
“ ‘In deciding whether a public official .,. is entitled to qualified immunity in a § 1983 action, this Court employs the following two-step analysis:
“ ““ “1) The defendant public official must first prove that ‘he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.’
“ ““ “2) Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant’s part. This burden is met by proof demonstrating that the defendant public official’s actions ‘violated clearly established constitutional law.’ ” ””
“Ex parte Sawyer, 876 So.2d 433, 439 (Ala.2003) (quoting Couch v. City of Sheffield, 708 So.2d 144, 155 (Ala.1998), quoting in turn Roden v. Wright, 646 So.2d 605, 610 (Ala.1994)). The second prong is satisfied if the plaintiff proves that ‘ “(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time, of the alleged violation.” ’ Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158. (11th Cir.2010) (quoting Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir.2004)).
“.., The United States Court of Appeals for the Eleventh Circuit has defined the term ‘discretionary authority to include ‘all actions of a governmental official that (1) “were undertaken pursuant to the performance of his duties,” and (2) were “within the scope of his authority.” ’ Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir.1994) (quoting Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir.1988)).”
160 So.3d at 755-56.
As previously indicated, Cpt. Hutton was acting within the scope of his discretionary authority when he investigated the cell-phone incident involving Fields and Maull and determined that Fields, the victim’ of a cell-phone theft, did not pose a threat to the general prison population and did not place Fields in administrative segregation. The violent incident that ultimately occurred between Fields and Elliott was, as described by Fields, spontaneous insofar as it transpired after Fields had returned to the “D” dormitory and had learned that Elliott had stolen his remaining cell phones. Accordingly, the burden shifted to McCas-kill to demonstrate that the prison defendants' actions. violated clearly established constitutional law. To meet this burden, McCaskill was required to produce sufficient evidence of a substantial risk of serious harm of which the prison defendants were subjectively aware; the prison defendants’ deliberate indifference to that risk; and causation. Caldwell, supra. As previously indicated, the evidence reflects that Cpt. Hutton could not have been subjectively aware of any substantial risk of harm that Fields may have posed, to Elliott insofar as Cpt. Hutton testified that he had no knowledge of Elliott’s involvement in the first cell-phone theft involving Fields and Maull; Fields also . testified that he was unaware the Elliott had been *1183 involved in the scheme by which Maull took his cell phone. In other words, the evidence demonstrates that the attack by Fields on Elliott was not foreseeable, but, rather, spontaneous, as described by Fields.
McCaskill further alleges that the prison defendants allowed a culture' of violence and terror to reign in the facility as a result of the proliferation of contraband cell phones and that the prison defendants failed to take corrective measures to abate the inmate-on-inmate violence in the facility caused by the contraband cell phones. Specifically, she alleges, in pertinent part:
“Price and Estes were aware of the ‘substantial risk of harm’ to inmates regarding the proliferation of cell phones. Hutton testified that reports of inmate conflicts are given to the warden.... Due to the fact that violent incidents occur over cell phones ..., and they occur all the time ,, and because reports are made to Price and Estes, [the prison defendants] are aware of [the] substantial risk of danger inmates face [in the facility].
[[Image here]]
“Price and Estes’ conduct is not simply negligent, but willful as neither Price, nor Estes have provided any evidence that they have taken ‘reasonable steps to abate’ the substantial risk of harm to inmates,... ”
McCaskill relies primarily on Fields’s deposition testimony, in which he stated that violent acts over cell phones, including “stabbings and killings,” occur at the facility “all the time.” However, McCaskill failed to question any of the prison defendants as to whether there were any documented cases of stabbings and killings that had occurred at the facility as a result of arguments over cell phones. Although Cpt. Hutton acknowledged that he was aware that contraband cell phones were present in the facility, he nonetheless testified that there were very few violent incidents, that occurred as a result of-the phones:
“Q. [Counsel for McCaskill:] To your knowledge, being in the penitentiary and where cell phones have been around, would you say that the possession or the fact the cell phones are in prison are the cause of a lot of violent confrontatións in prison? Is that a fair statement?
“A. No, it is not a fair statement. There are incidents, but it’s not a lot of incidents.
“Q. ... Of the violent situations you’ve seen among inmates, would the taking of cell phones be included as a cause of violent conflicts between inmates?
“A. It can be.
“Q. Okay. And to your knowledge or understanding through experience, how do inmates normally react to their cell phones being taken as opposed to even any other property?
“A. ' Well, it just depends on the individual.

d

“A. Some—some are combative. Some are noncombative about it. Those that don’t want to bring attention to themselves, tjiey don’t—I mean, they don’t even report it.
“Q. But it would be fair to say that inmates often react violently when cell phones are taken?
«
“A. Not often.
“Q. Not often?
“A. There are very few.”
Price also testified that fights over cell phones are considered to be unusual incidents insofar as fights are “outside the norm of the routine operations.” Price *1184 further testified that all fights are documented. However, McCaskill never questioned the prison defendants regarding the number of documented cases involving fights over cell phones. In essence, McCaskill never questioned the prison defendants concerning the dynamics of contraband cell phones within the facility. Again, she never questioned the prison defendants as to whether there had been any documented cases of fights, stabbings, or killings that had occurred at the facility, nor did she question them regarding the method and manner in which and/or the frequency with which searches are conducted in order to limit contraband cell phones in the facility. It is also noted that the facility has policies that prohibit possession of cell phones. More specifically, the “rule violations sanctions table” states that the possession of a “cellular telephone shall result in the loss of six (6) months of visitation privileges and a $25.00 processing fee per offense. The fee shall increase by $25.00 per offense.” McCaskill never questioned the prison defendants concerning the policy in the facility on the possession of cell phones, nor did she question them about the number of documented cases of rule violations involving contraband cell phones. In other words, McCas-kill has failed to meet her burden of providing substantial evidence that the prison defendants were subjectively aware of any serious risk of harm Fields posed to Elliott or that they were subjectively aware of any serious risk of harm created by the presence of contraband cell phones in the facility. Accordingly, McCaskill failed to provide sufficient evidence indicating that Elliott’s death was caused by the prison defendants’ “deliberate indifference.”
We also note that McCaskill presented the affidavit of James G. Houston, a professor of criminal justice and former director of the School of Criminal Justice at Grand Valley State University, who opined that the prison defendants had been deliberately indifferent to Elliott’s safety and well-being. However, based on our discussion above, we conclude that Houston’s opinion is not sufficient to support a finding that the prison defendants were subjectively aware of a serious threat of substantial harm created by the presence of cell phones in the facility. Houston states in his affidavit, in pertinent part:
“The primary issue is this case is the death of Tyus Elliott. The question is, to what extent are the [prison] defendants deliberately indifferent to the conditions that resulted in the death of inmate Elliott? The short answer, in my opinion, is a great deal. The incidents leading to the altercation in which Elliott was stabbed is a result of poor control of contraband, improper and inadequate supervision of the dormitory in which the altercation occurred, and failure to abide by [the DOC] policy directives and American Correctional Association Standards for Adult Correctional Institutions.
"... The most effective way to discourage possession of contraband is to maintain a rigorous search program of all public areas and dormitories. A reading of Fields’s deposition gives the impression that the presence of cell phones among inmates is an endemic problem that does not receive enough attention. While documentation of numbers of cell phones confiscated is unavailable it is apparent that the [prison] defendants are deliberately indifferent to the presence of cell phones to the detriment of institutional tranquility.”
As can be seen, Houston relies primarily on Fields’s deposition testimony in which Fields states that “stabbings and killings” occur at the facility “all the time.” However, as previously indicated, McCaskill never questioned any of the prison defen *1185 dants regarding whether there had been any other documented “stabbings and killings” at the facility, nor did she question them regarding the method and manner in which and/or the frequency with which searches are conducted to abate the probr lem of contraband cell phones in the facility. Cpt. Hutton testified that very few violent incidents occurred over the presence of contraband cell phones, and Price testified that fights between inmates over cell phones are unusual. Again, the record evidence demonstrates that McCaskill failed to meet her burden of establishing that the prison defendants violated clearly established constitutional law.

TV. Conclusion

Based on the evidence presented, the DOC and the prison defendants are entitled to immunity from all claims asserted against them by McCaskill in her complaint. Accordingly, the DOC and the prison defendants have shown a clear legal right to the relief sought, and the circuit court is directed to enter a summary judgment in their favor.
PETITION GRANTED; WRIT ISSUED.
MAIN and BRYAN, JJ., concur.
MURDOCK, J., concurs specially.
MOORE, C.J., concurs in the result.

. The petitioners, in footnote 1 of the petition, state the following, which was not disputed by the respondent in her response brief:
"The [DOC] has joined this petition out of an abundance of caution. Although its name did not appear in the caption of the original complaint, [the DOC] is mentioned briefly in the original complaint (but not in the amended- complaint). To complicate matters further, [the respondent] filed a motion to dismiss [the DOC] as a defendant, but there is no indication the motion was granted (though unopposed). Information on the ‘Alabama Sjis Case Detail’ still lists [the DOC] as an active party. [The respondent’s] counsel, upon inquiry, stated to Petitioner’s counsel on September 30, 2015, *1173 that he did not seek to retain [the DOC] as a party-defendant. ’ ’
We have assumed for purposes of this opinion that the DOC is a petitioner.

. Fields pleaded guilty to manslaughter.

. The DOC "Rule Violations Definitions and Examples" defines "possession of contraband” as:
“The possession of any item NOT issued to an inmate by the [DOC] or retained in its present form, location, or intended use, sold in the canteen/snack line, or authorized by the Warden. To include, but not be limited to, weapons (i.e. firearms, knives, clubs, tools, etc.) ammunition, intoxicant, currency, escape device(s).’’
The DOC defines the "unauthorized possession of a phone(s)/accessory(s)" to include possession of "[a]ny communication device(s), or accessary(s) NOT issued to an inmate by the [DOC].”

. McCaskill also sued Km Thomas, commissioner of the DOC; Vernon Barnett, former deputy commissioner of the DOC; and James Deloach, associate commissioner of the DOC. However, the circuit court entered a summary judgment in favor of those defendants on August 14, 2015.

. The DOC and the prison defendants note in their petition that they objected to McCaskill’s amended complaint, filed over three years after the original complaint and nearly two and one-half years after the first trial setting, because, they say, McCaskill did not seek or obtain leave of court for the filing of the amended complaint. The DOC and the prison defendants state that no ruling has been handed down by the circuit court relative to their objection to the amended complaint. The timeliness of the amended complaint is not an issue on appeal.

. Cranman was a plurality opinion. The test set out in Cranman and discussed infra was *1178 subsequently adopted by a majority of the Court in Ex parte Butts, 775 So. 2d 173 (Ala.2000).